UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| RICHARD LEE SPRINGER,<br><br>                     Plaintiff,<br><br>      vs.<br><br>ANDREW SAUL, Commissioner of the<br>Social Security Administration,<br><br>                 Defendant. | 4:19-CV-04030-VLD<br><br><br>MEMORANDUM OPINION<br>AND ORDER |

## INTRODUCTION

Plaintiff, Richard Lee Springer, seeks judicial review of the Commissioner's final decision denying his application for social security disability benefits under Title II of the Social Security Act.[1]

---

[1]SSI benefits are called "Title XVI" benefits, and SSD/DIB benefits are called "Title II" benefits. Receipt of both forms of benefits is dependent upon whether the claimant is disabled. The definition of disability is the same under both Titles. The difference--greatly simplified--is that a claimant's entitlement to SSD/DIB benefits is dependent upon one's "coverage" status (calculated according to one's earning history), and the amount of benefits are likewise calculated according to a formula using the claimant's earning history. There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any. There are corresponding and usually identical regulations for each type of benefit. See e.g. 20 C.F.R. §§ 404.1520 and 416.920 (evaluation of disability using the five-step procedure under Title II and Title XVI). Mr. Springer filed his application for Title II benefits only. AR184-87. His coverage status for SSD benefits expires on September 30, 2020. AR217. In other words, in order to be entitled to Title II benefits, Mr. Springer must prove disability on or before that date.

Mr. Springer has filed a complaint and has requested the court to reverse the Commissioner's final decision denying him disability benefits and to remand the matter to the Social Security Administration for further proceedings.

This appeal of the Commissioner's final decision denying benefits is properly before the court pursuant to 42 U.S.C. § 405(g). The parties have consented to this magistrate judge handling this matter pursuant to 28 U.S.C. § 636(c).

## FACTS[2]

### A.     Statement of the Case

This action arises from plaintiff Richard Lee Springer's application for Title II disability benefits filed on March 30, 2016, alleging disability since October 5, 2015, due to social anxiety, depression, stress, sleep apnea, dizzy spells, high blood pressure, lack of focus, short and long term memory loss, obesity, and cerebral palsy, including lack of hand-eye coordination, lack of muscle strength and dexterity, slowness and restriction in movement, all more affected on the right side. AR181-190, 221, 257, 261, 285 (citations to the appeal record will be cited by "AR" followed by the page or pages).

Mr. Springer's claim was denied initially and upon reconsideration. AR143, 149. Mr. Springer then requested an administrative hearing. AR156.

---

[2] These facts are recited from the parties' stipulated statement of facts (Docket 15). The court has made only minor grammatical and stylistic changes.

Mr. Springer's administrative law judge (ALJ) hearing was held on March 15, 2018, by ALJ Jeffrey N. Holappa. AR76-112. Mr. Springer was represented by a non-attorney representative at the hearing, and an unfavorable decision was issued on May 4, 2018. AR8-27, 79.

At Step One of the evaluation, the ALJ found that Mr. Springer was insured for benefits through September 30, 2020, and that he had not engaged in substantial gainful activity ("SGA") since October 5, 2015, the alleged onset of disability date. AR13.

At Step Two, the ALJ found that Mr. Springer had severe impairments of cerebral palsy with right spastic hemiparesis,[3] generalized anxiety disorder, major depressive disorder, personality disorder, panic disorder, and social anxiety disorder, finding that each of those medically determinable impairments significantly limited Mr. Springer's ability to perform basic work activities as required by Social Security Ruling (SSR85-28). AR13.

The ALJ found that Mr. Springer also had a medically determinable impairment of urinary frequency, but found that it was not severe because the treatment note reflected that Mr. Springer reported, "good bowel and bladder control," as of March, 2016, and he has not sought any further evaluation or treatment for this symptom. AR13.

---

[3] Cerebral palsy is a group of disorders that affect a person's ability to move and maintain balance and posture. Spastic cerebral palsy is the most common type and causes muscles to be stiff and movements to be awkward. Spastic hemiplegia/hemiparesis affects only one side of the body with the arm usually affected more than the leg. See https://www.cdc.gov/ncbddd/cp/facts.html. All internet citations in this opinion were last checked October 1, 2019.

The ALJ found that Mr. Springer also had medically determinable impairments of sleep apnea, hypersomnia, and a deviated septum. AR14. The ALJ found that Mr. Springer underwent continuous positive airway pressure (CPAP) titration, which determined that proper adaptive servo-ventilation (ASV) therapy would control the majority of Mr. Springer's respiratory events and snoring. AR14. In addition, while Mr. Springer complained of daytime fatigue and sleepiness through March, 2016, these complaints do not reappear in his treatment records from 2017. AR14. Given the brevity of Mr. Springer's complaints of these symptoms to medical providers and the documented efficacy of proposed treatment, the ALJ determined Mr. Springer's sleep apnea, hypersomnia and deviated septum are not severe impairments. AR14.

The ALJ found that Mr. Springer also had medically determinable impairments of obesity with a BMI ranging from 37.3 to 40.3. AR14. The ALJ found there is no persuasive evidence that Mr. Springer's obesity significantly affects or exacerbates his physical impairment. AR14. The ALJ also found that Mr. Springer had not undergone any special treatment for weight loss and does not make any significant allegations that his weight causes, or contributes to, any degree of functional limitations. AR14. Therefore, the ALJ found Mr. Springer's obesity is non-severe. AR14.

At Step 3, the ALJ found that Mr. Springer did not have an impairment, or combination of impairments, that met or medically equaled one of the listed impairments in 20 CFR 404, Subpart P, App 1 (hereinafter referred to as the "Listings"). AR14. The ALJ considered the cerebral palsy impairment under

4

Listing 11.07 and found there is no persuasive evidence of disorganization of motor function in two extremities (see 11.00D1) resulting in extreme limitation (see 11.00D2) in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities. AR14. There is also no persuasive evidence of a marked limitation (see 11.00G2) in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself. AR14-15.

The ALJ also considered the mental impairments under Listings 12.04 and 12.06 and considered whether the "paragraph B" criteria are satisfied. AR15. The ALJ found that Mr. Springer had mild limitations in understanding, remembering or applying information because Mr. Springer had an overall mental status exam score of 27/30, which is in the average range. AR15.

The ALJ found Mr. Springer had moderate limitations in interacting with others because his mental status exams reveal normal dress, behavior, appearance, and speech. AR15. The ALJ noted that Mr. Springer's mental status exams revealed extreme anxiety at times. AR15. The ALJ found Mr. Springer had moderate limitations with concentration, persistence or maintaining pace because although his mental status exams have occasionally shown depressed mood, anxious affect, and agitated presentation, many mental status exams have revealed normal findings, and Mr. Springer was able to accurately perform serial seven calculations. AR15.

The ALJ found Mr. Springer had mild limitations in adapting or managing oneself because Mr. Springer has not shown evidence of

decompensation, despite having undergone major life changes; while Mr. Springer has developed depression while adapting to such changes, there has not been a significant disruption in his ability to adapt to changes; nor is he regularly observed to be malodorous, unkempt, disheveled or otherwise display indicia of an inability to manage oneself. AR15. Therefore, Mr. Springer did not meet a Listing. AR14-15.

The ALJ determined that Mr. Springer had the residual functional capacity ("RFC") to perform:

> light work as defined in 20 CFR 404.1567(b) except that the claimant can lift and carry up to 20 pounds occasionally and 10 pounds frequently; can sit for six hours in an eight-hour day; can stand for six hours in an eight-hour day; can walk for six hours in an eight-hour day; can occasionally push and pull with the right upper and lower extremity; can occasionally climb ramps and stairs; can never climb ladders or scaffolds; can occasionally balance, stoop, kneel, crouch and crawl; can frequently reach (both overhead and all other directions) with the right upper extremity; and can frequently handle, finger and feel with the right hand. The claimant cannot tolerate exposure to unprotected heights or moving mechanical parts. The claimant would need hourly bathroom breaks lasting five minutes in duration. Finally, the claimant is capable of only simple, routine tasks, with simple work-related decisions, and occasional interactions with supervisors, co-workers and the general public.

AR16.

The ALJ noted Mr. Springer testified, in part, as follows:

> The claimant testified that he was unable to work due to panic, anxiety, depression, fatigue, sleepiness, and difficulty with right hemiparesis and spasticity. The claimant testified that he has problems with right hand dexterity due to cerebral palsy. This has caused problems for him when he worked at Pizza Hut mixing dough. The claimant has sought out work where such dexterity is not required. The claimant has worked at Esurance, but developed anxiety due to the failing health of his mother. The claimant had worked and been successful after transferring. He was able to

work [from] home. The claimant then had an out-of-state manager, and he did not get along with this person. The claimant's manager wanted him to cease working at home. The claimant indicated he could not do this because of his social anxiety and depression. . . . The claimant has not taken sertraline for over a year. He does not have health insurance. . . . He does not do a lot of laundry. He can physically perform the light household tasks in his apartment. The claimant goes shopping at night to avoid crowds. He becomes too anxious to effectively shop there during the day. The claimant feeds his cats. The claimant gets anxiety attacks.

AR16-17.

The ALJ's subjective symptom finding was that Mr. Springer's medically determinable impairments could reasonably be expected to produce the symptoms he alleged, but his statements concerning the intensity, persistence and limiting effects of his symptoms were not "entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." AR17.

The ALJ considered a January, 2016, MRI of the brain that revealed findings consistent with cerebral palsy. AR17. The ALJ found that the MRI findings may account for Mr. Springer's right sided symptoms, but the mere presence of objective abnormalities does not, in and of itself, equate to a specific functional limitation, nor does it necessarily indicate the frequency or severity of symptoms caused by the abnormalities. AR17.

The ALJ also found that Mr. Springer's exam findings do not support the presence of disabling symptoms, noting:

Exams have revealed a boutonniere-type deformity of the right hand; spasticity, weakness and immobility of the right hand; atrophy of the right upper and lower extremities hemi-paretic gait; right spastic hemiparesis; 4-5/right foot strength; and

7

hyperreflexia in the right lower extremity. Exh. 3F, pp. 3, 24; Exh.
6F, pp. 6, 7; Exh. 7F, p. 6. These findings are consistent with
some degree of difficulty lifting and carrying heavy objects,
engaging in constant postural activity, or engaging in constant
activity with the right upper and lower extremity. However, the
claimant's exams have also revealed normal strength; stable gait;
normal sensation; and normal range of motion. Exh. 1F, p. 3; Exh.
3F, pp. 10, 20; Exh. 7F, p. 3. These findings demonstrate
sufficient strength to lift and carry up to 20 pounds occasionally;
occasionally push and pull with the right upper and lower
extremity; frequently handle, reach, feel, and reach in all direction
with the right arm; and occasionally engage in most postural
activity.

AR17-18.

The ALJ considered Mr. Springer's treatment history and found it

inconsistent with the presence of disability impairments. The ALJ found:

While he has sought some treatment for sleep apnea and
hypertension, he does not require any treatment to manage his
symptoms of cerebral palsy. He does not require any assistive
treatment devices. He does not use any braces. Therefore, while
the claimant's treatment history is consistent with some degree of
limitation, it is not consistent with a disabling degree of limitation.

The claimant has been diagnosed with social anxiety disorder,
personality disorder, major depressive disorder, and panic
disorder. Exh. 2F. The claimant has been prescribed medications
such as Fluoxetine, Wellbutrin, and sertraline. Exh. 6F, p. 3.

This degree of treatment is consistent with some degree of mental
limitation. However, the undersigned notes that the claimant has
not been psychiatrically hospitalized. Nor has he been seen in the
ER for symptoms of a panic or anxiety attack. Although he has
been on medications in the past, he reported that he took no
medications for depression or anxiety currently. The undersigned
also notes that when the claimant presented for a mental health
intake in March 2016, he indicated he was hopeful that a
psychiatry referral would "assist with his disability claim." Exh.
3F, p. 5. The claimant was reminded that the purpose of such a
referral would be primarily for treatment of his symptoms, that he
had reported seeing a psychiatrist in the past, and had reported
that he knew that medications would not help. Exh. 3F, p. 5.
Despite this, he indicated he wanted another referral to a

8

psychiatrist, whose purpose would only be to diagnose and manage his symptoms though the use of medications. Exh. 3F, p. 5. In addition, the claimant took the MMPI twice, but his results were invalid due to a pattern of atypical and rarely given responses with resulting "grossly over-elevated" clinical scale profiles, and suggesting "possible exaggeration." Exh. 2F, p. 13. Therefore, while the claimant's treatment history supports some degree of limitation, it is not inconsistent with a disabling degree of limitation.

AR18.

The ALJ considered Mr. Springer's mental status exam findings of

depression and anxiety and found they are not as persistent or limiting as

Mr. Springer's allegations might suggest. AR18-19. The ALJ found:

The claimant's mental status exams have revealed depressed and severely anxious mood; flat and labile affect; agitated psychomotor activity; and difficulty expressing himself. Exh. 2F, p. 3.; Exh. 3F, pp. 6, 8, 24, 29; Exh. 6F, p. 7. Formal mental status exam revealed an inability to recall more than three out of five objects on delayed recall, nor an ability to repeat a three-digit sequence in reverse. Exh. 2F, p. 5. These findings are consistent with some degree of limitation in the ability to sustain concentration or interact with others.

However, the claimant's mental status exams have often revealed no abnormalities, and generally reflect appropriate dress, hygiene, and grooming; cooperative demeanor; normal thought processes, content, and associations; appropriate affect and speech. Exh. 1F, p. 1; Exh. 3F, p. 25; Exh 7F, p. 4; Exh. 8F, p. 3. Formal mental status exams finding[s ] have revealed an intact ability to perform serial seven calculations and an overall score of 27/30 on the Montreal Cognitive Assessment (MOCA), which is in the average range. Exh. 2F, p. 5.

These mental status exam findings suggest that the claimant's depression and anxiety are not as persistent or limiting as the claimant's allegations might suggest. The findings of normal speech, behavior, and appearance suggest that the claimant is able to get along appropriately with others on an occasional basis. In terms of his ability to sustain concentration, his depression and anxiety would preclude his ability to perform complex or detailed tasks. However, the relative normalcy of [his] mental status

exams, including his overall MOCA score and ability to perform serial seven calculations, demonstrate that he is able to perform simple routine tasks, and make simple work-related decisions.

AR18-19.

The ALJ considered that Mr. Springer's daily activities were inconsistent with the presence of disabling limitations. AR19. For example, Mr. Springer was able to pay bills, count change, use a checkbook, go shopping alone, drive, and followed spoken instructions fairly well. AR19, 259, 267, 269. The ALJ also noted that Mr. Springer's daily activities were fairly limited. AR19.

The ALJ considered the opinions of the State agency psychological consultant, Robin Carter-Visscher, Ph.D., who had found there was insufficient evidence in the record to determine if Mr. Springer had a medically determinable severe impairment, and found the opinion was not consistent with the current record and gave it little weight. AR20.

The ALJ considered the opinions of the State agency psychological consultant, Alison Musso, Ph.D., and gave her opinion partial weight because the opinion used imprecise and vocationally useless terminology in assessing Mr. Springer's ability to perform the mental aspects of work. AR21. The ALJ referred to Dr. Musso's opinion that Mr. Springer could perform "low stress, low social work." AR21.

The ALJ considered the opinions of Thomas Price, Ph.D., and stated he gave his opinion little weight. AR20. The ALJ gave Dr. Price's opinion little weight because the opinion was rendered after a single examination of

Mr. Springer, the opinion only addressed Mr. Springer's ability to perform one of his past jobs, the opinion did not suggest he would be unable to perform other types of work and the opinion that a claimant cannot work is an issue reserved for the Commissioner.  AR20.

The ALJ considered the opinions of the State agency medical consultants, and gave them partial weight because the ALJ found that Mr. Springer's ongoing exam abnormalities regarding his right upper extremity supported a greater degree of limitation on the use of that arm than envisioned by the medical consultants.  AR21.

The ALJ considered the opinion of treating physician Jeffrey Meyer, M.D., who the ALJ indicated had opined that Mr. Springer should work at home, and gave the opinion little weight.  AR19.  The ALJ found that Dr. Meyer's opinion was inconsistent with Mr. Springer's mental status exam findings and treatment history, Mr. Springer's current job at the time of the opinion rendered significant interaction with the public, and the opinion did not address whether Mr. Springer could perform other types of work.  AR19.

The ALJ considered the opinion of treating physician Jonathan Bannwarth, M.D., who the ALJ indicated had completed housing disability paperwork indicating Mr. Springer was unable to work.  AR20.  The ALJ gave Dr. Bannwarth's opinion little weight because the opinion was not explained in any detail, did not include function-by-function limitations, was not consistent with mental status exams, treatment history, or activities of daily living, and the issue of disability is reserved to the Commissioner.  AR20.

The ALJ considered the opinion of treating physician Bradley Kamstra, M.D., who the ALJ indicated completed a disability parking permit indicating Mr. Springer was disabled and would be unable to work until further notice. AR21. The ALJ gave Dr. Kamstra's opinions little weight because they were not explained in any detail, did not include function-by-function limitations, was not consistent with mental status exams, treatment history, or activities of daily living, and the issue of disability is reserved to the Commissioner. AR21.

Based on the RFC determined by the ALJ, the ALJ found that Mr. Springer was not capable of performing his past relevant work. AR21-22.

At Step 5, the ALJ found Mr. Springer capable of adjusting to other work that existed in significant numbers such as a copy machine operator, DOT# 207.685-014; mail clerk, DOT# 209.687-026; and clerical checker, DOT# 222.687-010, relying on testimony from the vocational expert regarding the number of jobs available for each occupation nationally and denied the claim. AR22-23.

Mr. Springer timely requested review by the Appeals Council and submitted additional evidence related to his cerebral palsy, an article or excerpts from a website, as well as a personal statement. AR33-75, 310-313. The Appeals Council denied Mr. Springer's request for review, making the ALJ's decision the final decision of the Commissioner. AR1-7. When denying Mr. Springer's request for review, the Appeals Council considered the personal statement Mr. Springer submitted. AR1-7.

**B.     Plaintiff's Age, Education and Work Experience**

Mr. Springer was born in April of 1975 and completed the 12th grade in 1993.  AR222.

The ALJ found that Mr. Springer had past relevant work as a telephone customer clerk and a statistical report clerk.  AR21.

**C.     Relevant Medical Evidence (chronological sequence)**

Mr. Springer saw Dr. Meyer at Sanford Family Medicine on October 5, 2015, to follow up on depressive symptoms including depressed mood, anhedonia, anxiety, diminished interest in activities, diminished concentration, fatigue, feelings of worthlessness, feelings of inappropriate guilt, hopelessness, and insomnia.  AR382.  Mr. Springer had been seen approximately one year earlier with symptoms gradually getting worse.  AR382.  Mr. Springer reported that he liked his work, but would like to work from home, as he was having trouble keeping up and was worried he might lose his job or be forced into the office to work.  AR382.  He reported that the social anxiety at the office was more than he could stand.  AR382.  Mr. Springer was alert, oriented to time, person and place, and his thought content, speech, affect, mood and dress were normal.  AR382.  Zoloft and Ambien were prescribed, counseling recommended, and he was put off work for three weeks.  AR382.

Mr. Springer saw Dr. Meyer at Sanford Family Medicine on November 16, 2015, to follow up on his anxiety, depression, and insomnia and reported he continued to struggle with anxiety and was not sleeping well.  AR376.  He reported he would like to continue to work from home because he felt the office

environment was too stressful.  AR376.  Dr. Meyer noted Mr. Springer's anxiety was improving.  AR376.  Dr. Meyer stated he was willing to recommend that he work from home.  AR377.

On November 18, 2015, Mr. Springer contacted Dr. Meyer's office complaining of sweats, which he felt were due to his medications, but Dr. Meyer stated he had discussed this with Mr. Springer before and felt that the sweats were due to his anxiety, not his medications.  AR376.

Mr. Springer saw Dr. Meyer at Sanford Family Medicine on November 25, 2015, for his anxiety and Mr. Springer reported he was really struggling. AR375.  He was having chest pain, sweats, and sleeping problems.  AR375. Mr. Springer felt he would be able to return to work on December 8 if things worked out. AR375.  Mr. Springer also reported some neuropathy in his right fourth and fifth fingers, which Dr. Meyer noted was the extremity that Mr. Springer had his disability from cerebral palsy, and Mr. Springer was wondering about getting botox shots for spasticity.  AR375.

Examination revealed that Mr. Springer was "extremely anxious as usual," and it was difficult to hold a conversation with him because of his interruptions.  AR375.  Examination of his right arm revealed chronic spasticity from cerebral palsy and some numbness in the ulnar nerve distribution.  AR375. Seroquel was added to his medications to help with mood and sleep.  AR375.  Mr. Springer had been seeing a counselor, and Dr. Meyer recommended continued counseling.  AR375.  Dr. Meyer stated he would be

happy to fill out paperwork to put him back to work on December 8 if possible. AR375.

Mr. Springer was seen on December 1, 2015, at Midwest Ear, Nose and Throat for evaluation of possible sleep apnea. AR318. Mr. Springer reported excessive daytime sleepiness with decreased concentration and frequent memory problems. AR318. Objective findings show Mr. Springer was in no apparent acute or chronic distress; had normal ability to communicate; had normal and appropriate mood and affect; and had normal gait. AR319-20. Following examination, the assessments were deviated nasal septum, hypertrophy of nasal turbines, and hypersomnia, and a polysomnogram was recommended. AR320.

Mr. Springer saw Dr. Meyer at Sanford Family Medicine on December 10, 2015, for anxiety and insomnia and continued to report being exhausted during the day and sleeping poorly at night. AR374. He continued to be unable to work. AR374. Dr. Meyer noted that it was very unusual for someone to miss work due to sleep apnea, but noted Mr. Springer was an extremely anxious individual, and Dr. Meyer felt he would have great difficulty working and excused him from working until the end of the year. AR374.

Mr. Springer underwent a sleep study on December 22, 2015, at the Sleep Center of the Midwest which revealed moderate obstructive sleep apnea, and severe treatment emergent central apnea, which was resistant to CPAP and BIPAP therapy. AR321. A titration study with ASV therapy was presented as an option. AR321.

Mr. Springer saw Dr. Meyer on January 4, 2016, to discuss his sleep study. AR366. Dr. Meyer noted he would start an echocardiogram, urine drug test, and an MRI of the brain for workup of Mr. Springer's central apnea. AR367. In an addendum dated January 15, 2016, Dr. Meyer noted Mr. Springer's MRI showed his cerebral palsy but nothing acute; his echocardiogram had normal ejection fraction; and his urine drug screen was negative. AR367. Dr. Meyer noted Mr. Springer was anticipated to return to work by February 1. AR367.

Mr. Springer had the follow-up full night, titration sleep study on January 18, 2016, at the Sleep Center. AR327. ASV pressures were gradually increased, and the majority of respiratory events and snoring were controlled. AR327. The impression was complex sleep apnea with past CPAP failure, snoring controlled with positive pressure therapy, and follow-up was recommended for ASV therapy. AR327.

Mr. Springer saw Dr. Meyer at Sanford Family Medicine on January 29, 2016, for anxiety and sleep issues. AR363. Dr. Meyer noted that based on sleep studies, a brain MRI and an echocardiogram, he had been diagnosed with central sleep apnea and determined to be a candidate for an ASV, a specialized CPAP for his type of sleep apnea. AR363. Mr. Springer was waiting for insurance approval to obtain the machine and remained exhausted, and his chronic anxiety had been much worse due to this problem. AR363. Dr. Meyer continued to keep him off work while waiting for the ASV machine. AR363.

On February 3, 2016, Mr. Springer contacted Dr. Meyer's office stating his short-term disability company was not finding any abnormal findings on his recent exams to explain why he was still not working. AR363. Dr. Meyer stated there would never be abnormal physical exam findings for his condition, but they could get a psych assessment for his anxiety. AR363.

Mr. Springer saw Dr. Meyer on February 24, 2016, on follow-up for his anxiety, depression and sleep apnea. AR359. Dr. Meyer noted Mr. Springer started CPAP and hoped it worked and helped his sleep and anxiety. AR359. Dr. Meyer had also doubled Mr. Springer's medication dose for his mood and for his hypertension since his last visit. AR359.

Mr. Springer was seen on March 4, 2016, at Sanford Family Medicine by Nicole Vlegersdyk, LPC-MH, for an initial assessment of his mental health symptoms. AR355-56. Ms. Vlegersdyk noted Mr. Springer was seeking short-term disability and was hopeful that the psychiatry referral would assist with his disability. AR356. Ms. Vlegersdyk explained to Mr. Springer that a psychiatry referral was to help with symptoms presented/diagnosis and that short-term disability was secondary. AR356. Ms. Vlegersdyk noted Mr. Springer saw a psychiatrist one time at Falls Community Health and went to two therapy sessions in November, 2015, and he reported, "they just wouldn't throw medication at the problem and I know that wouldn't help." AR356. Ms. Vlegersdyk documented that Mr. Springer still wanted to go through with the referral for a psychiatric evaluation. AR356. Examination revealed Mr. Springer was agitated, anxious, had excessive worry, and he

reported panic attacks and memory problems. AR357. He was given a psychiatric referral. AR358.

On March 15, 2016, Mr. Springer contacted his primary care clinic regarding a psychiatric exam, scheduled with Dr. Price, that Mr. Springer's disability company had requested. AR355. Dr. Meyer referred Mr. Springer to Thomas Price, Ph.D., for additional information on Mr. Springer's short-term disability through his employer, related to Mr. Springer's anxiety, depression, and insomnia. AR335.

On March 23, 2016, Dr. Price conducted a psychological evaluation at Dr. Meyer's referral. AR335. Dr. Price's psychological evaluation consisted of records review, behavioral observations, sleep-related screening, functional impairment ratings, Barkley Deficits in Executive Functioning Scale, mental status exam, Montreal Cognitive Assessment, vocational history review, Occupational Stress Inventory and personality testing (administered twice). AR335-350. Dr. Price noted that Mr. Springer reported he has cerebral palsy on his right side, but his left side is normal, and his cerebral palsy has not affected his cognitive functioning. AR343. Mr. Springer denied going to the emergency department for mental health problems and reported never receiving inpatient or residential mental health care, other than very limited counseling at the Sanford Clinic. AR344.

Dr. Price observed that Mr. Springer was alert throughout the evaluation, but did appear a bit sleepy at several points. AR336. Examination revealed very flat affect, depressed mood, emotionally labile, easily agitated and tense at

18

times.  AR336.  Mr. Springer became more easily distracted as the evaluation
proceeded.  AR336.  Mr. Springer was given the Montreal Cognitive Assessment
(MOCA) which indicated he had mild attention and memory-related difficulties.
AR342.  Mr. Springer was given the Occupational  Stress Inventory, which
revealed significant problems in the workplace.  AR346.  Mr. Springer was
twice given the Minnesota Multiphasic Personality Inventory – Revised (MMPI-
2), which showed excessive number of atypical and rarely given responses to
the inventory.  AR347.  Based on the MMPI-2 results, Dr. Price noted Mr.
Springer's clinical scale profile could be grossly over-elevated because of the
severity of his psychopathology, an extreme plea for help or deliberate
malingering.  AR347.  Dr. Price concluded that Mr. Springer's overstatements
and possible exaggeration were too extreme for further interpretation and his
MMPI-2 profile were not considered.  AR347.

Mr. Springer also completed the Million Clinic Multiaxial Inventory –
Third Edition (MCMI-III), designed to assess both clinical syndromes as well as
personality patterns.  AR347.   Mr. Springer's MCMI-III response tendency
scores indicated that he magnified the level of experienced illness or
characterlogical inclination to be self-pitying, and his Clinical Syndromes scale
may be somewhat exaggerated, but standard scale modifications were utilized
to account for his response style.  AR347.  The MCMI-III indicated Mr. Springer
was experiencing major depression.  AR347.

Following the tests, Dr. Price diagnosed Mr. Springer with major
depressive disorder, recurrent, severe, without psychotic features; generalized

anxiety disorder; panic disorder with agoraphobia; personality disorder with avoidant and depressive personality traits; and complex sleep apnea. AR349. Dr. Price concluded that Mr. Springer met the definition of disability given by his employer because his mental illness prevented him from performing one or more of the essential duties of his occupation. AR349. Dr. Price noted that Mr. Springer's mental disorder had adversely impacted his ability to function in occupational and social settings, and that he was experiencing lethargy, significant fatigue, daytime sleepiness, impatience, irritability, low tolerance for frustration, poor motivation, problems focusing his attention, difficulties with vigilance, problems processing information, problems remembering, lack of self-discipline, agitation and anxiety towards others, and challenges to remain in social settings or interact with others. AR349.

Dr. Price also stated Mr. Springer was inclined to perceive others' comments or reactions in a negative way; he predicts that he will not be treated well and has a tendency to react abruptly and in an irrational manner; he is easily annoyed; his mood shifts quickly; and when away from home he becomes tense and panicky. AR350. Dr. Price concluded that Mr. Springer's worry, panicking, low mood, moodiness, and social apprehension prevent him from performing his current job. AR350.

On March 28, 2016, Mr. Springer went to Eugenio B. Matos, M.D., a neurologist with Sanford Health, regarding his sleep apnea. AR354. Dr. Matos noted Mr. Springer had a history of cerebral palsy with right spastic hemiparesis, which had been stable. AR354. Dr. Matos conducted a physical

examination and noted Mr. Springer was in no distress; was alert and oriented; and had normal speech and normal memory. AR354. Mr. Springer's cranial nerves were normal, and he had no facial asymmetry or weakness. AR354. Due to cerebral palsy, Mr. Springer had right spastic hemiparesis, overall 5-5 exempt for right foot dorsiflexion, which is 4-/5, stable as per Mr. Springer, and he had no involuntary movements. AR354. Mr. Springer's sensory was normal bilaterally; his finger-nose-finger was normal; and his gait was right hemiparetic but stable. AR354. Dr. Matos' impression was central sleep apnea with complex sleep apnea seen after treatment of obstructive sleep apnea, spastic cerebral palsy, and arterial hypertension. AR354. Dr. Matos' plan was to obtain report of CPAP and ordered laboratory testing. AR354.

A brain MRI obtained on January 6, 2016, showed a loss of white matter in the left frontoparietal region with ex vacuo dilatation of the left lateral ventricle, suggestive of chronic changes possibly due to an old ischemic insult in that region. AR354, 393, 408. "The MRI of the brain otherwise appear[ed] unremarkable. An acute process [was] not identified." AR393. Mr. Springer was complaining of daytime sleepiness and a polysomnogram obtained on December 22, 2015, had found moderate obstructive sleep apnea. AR354. A second polysomnogram on January 18, 2016, showed "complex sleep apnea with failure of CPAP (in the past) with snoring controlled by positive pressure of therapy." AR354. Mr. Springer was currently using a CPAP or ASV therapy, but was still feeling tired and sleepy during the day despite being compliant with the CPAP treatment. AR354.

Mr. Springer's significant tiredness and sleepiness was causing him to be off work. AR354. Dr. Matos examined Mr. Springer and noted he was in no distress; was alert, oriented; had normal speech and normal memory; his weight was stable at 233 pounds, with a BMI of 37.63; his cranial nerves II through XII and visual fields were normal; and he had no facial asymmetry or weakness. AR354. A motor exam showed right spastic hemiparesis, overall 5/5 except for right foot dorsiflexion, which is 4-/5, stable as per Mr. Springer due to cerebral palsy. AR354. Mr. Springer had no involuntary movements; had normal sensory bilaterally; and his gait was right hemiparetic but stable. AR354. Dr. Matos' impression was central sleep apnea with complex sleep apnea seen after obstructive sleep apnea and during polysomnogram, and spastic cerebral palsy, and Dr. Matos stated Mr. Springer might need cognitive behavioral therapy for insomnia. AR354-55.

On June 9, 2017, Mr. Springer was seen by Jonathan Bannwarth, M.D., a physician at Falls Community Health, to establish care since losing his insurance and to request that a work function form be filled out. AR432. Examination revealed atrophy on the right upper and lower extremities secondary to cerebral palsy, with reduced strength on the entire right side compared to the left side, and depressed mood. AR433.

On June 9, 2017, Dr. Bannwarth completed a "Work Ability Form" for the county's rental assistance program. AR426. In the form, Dr. Bannwarth stated Mr. Springer suffered from panic disorder, anxiety disorder, depressive disorder, complex sleep apnea, and avoidant and dependent personality traits.

AR426. Dr. Bannwarth stated Mr. Springer was not able to work because his mental illness adversely impacted his ability to function in a job setting. AR426. Dr. Bannwarth also stated Mr. Springer was unable to attend training programs and/or search for employment. AR426.

On November 6, 2017, Mr. Springer saw Dr. Kamstra of Falls Community Health, who noted Mr. Springer was applying for disability due to cerebral palsy that was diagnosed when he was two years old. AR431. Dr. Kamstra noted Mr. Springer was there asking for forms to be filled out. AR431. Dr. Kamstra noted Mr. Springer had a history of cerebral palsy, and his biggest deficit is most of his right arm. AR431. Dr. Kamstra stated, "I think the physical disability in addition to his psychological issues certainly have been compounded, and I do not foresee any changes that are going to happen, especially with the cerebral palsy. I think he will start getting more weakness and maybe some spasticity." AR431. Examination noted that Mr. Springer's arm "is kind of held at his side. He has boutonierre [sic] type deformity of his hand and certainly a weakness and immobility of that area. It is not completely flaccid. He can move it some, but he doesn't have the strength as compared to his left arm." AR431. Dr. Kamstra also noted Mr. Springer's mental issues will be an ongoing. AR431. Dr. Kamstra wrote a "To whom it may concern" note, stating that Mr. Springer was unable to work until further notice, and authorized Mr. Springer for a companion animal due to his mental health symptoms. AR436-37.

**D.**     **State Agency Assessments**

On July 21, 2016, Gregory Erickson, M.D., State agency physician consultant at the initial level, stated that Mr. Springer had severe cerebral palsy and could occasionally lift 25 pounds and frequently lift 20 pounds, and that Mr. Springer had no manipulative limitations. AR120-21. Dr. Erickson did state that Mr. Springer was limited to occasional pushing or pulling with the right upper and lower extremities due to his history of cerebral palsy with right spastic hemiparesis. AR120. Dr. Erickson also stated that due to cerebral palsy and spastic right hemiparesis, Mr. Springer had postural limitations and was limited to frequent balancing, kneeling, crouching, and crawling; to occasional climbing of ramps, stairs, ladders, ropes and scaffolds; and to avoid even moderate exposure to hazards, such as machinery and heights. AR120-21. Dr. Erickson noted that no ADL's were available for review when he issued his opinion, and that he gave heavy weight to the neurology exam from March 28, 2016, when he completed his opinion of Mr. Springer's physical residual functional capacity (PRFC). AR121. Dr. Erickson also found that Mr. Springer's sleep apnea and high blood pressure were considered non-severe impairments with medical compliance. AR121.

Gregory Stevens, M.D., State agency physician consultant at the reconsideration level, issued identical PRFC findings on September 27, 2016. AR133, 135-37. Dr. Stevens also stated that Mr. Springer had a history of cerebral palsy "although he is only noted to have a tremor at a couple of exams, otherwise is [sic] remains unnoticed...." AR132.

24

The state agency psychological consultant concluded:

Mental – [Mr. Springer] alleges significant social anxiety and depression. He does appear to have some limitations due to his mental allegations, but he is still able to go out alone, maintain romantic relationships, and grocery shop. He appears to have some difficulty taking instructions from supervisors. He is noted in evaluations to exaggerate symptoms, and the possibility of deliberate malingering was even mentioned. [W]hile he complains of increased anxiety in his appeal form, he does not seek mental health treatment. He is independent in his daily activities, and has no periods of inpatient hospitalizations. He is only noted to seek treatment when requesting letters or statements from providers in order to remain on short-term disability, otherwise he states he is uninterested in medications or therapy. He was noted to be capable of performing in his work at home[.] [I]t was when he was told to come into 5 days of training at the office that he stopped working.... [Mr. Springer] appears capable of low social unskilled work.

AR132.

On July 23, 2016, Robin Carter-Visscher, Ph.D., State agency psychological consultant at the initial level, stated that Mr. Springer had severe medically determinable impairments due to cerebral palsy and anxiety disorder. AR117. Dr. Carter-Visscher also seemed to indicate that she looked at whether the evidence supported the existence of an impairment due to an affective disorder and personality disorder, but indicated there was insufficient evidence in the file to evaluate the "B" and "C" criteria. AR117-19.

On September 28, 2016, Alison Musso, Ph.D., State agency psychological consultant at the reconsideration level, found that Mr. Springer had mild restrictions in ADLs, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace (the "B" criteria), and also found the evidence did not establish the presence of the

25

"C" criteria.  AR133.  Dr. Musso stated Mr. Springer was capable of "low social, low stress environment" unskilled work  AR132, 139.

**E.     Testimony at the ALJ Hearing**

**1.     Mr. Springer's Testimony**

Mr. Springer testified he lived alone in an "income-based" apartment, and received SNAP benefits.  AR81-82. Mr. Springer testified that he drives AR82.  Mr. Springer testified that he is 5'6" tall and weighs 235 pounds.  AR82. Mr. Springer testified that he was lefthanded as long as he could remember because he had cerebral palsy on the right side.  AR82.

Mr. Springer testified that he has some college education, majoring in computer science, but it did not work out because he was working a full-time job.  AR82.  Mr. Springer testified that he last worked at Esurance in January or February, 2016, but went on short-term disability.  AR83-84.  Mr. Springer also testified that he tried to go back to work at Esurance a couple of times, but it did not work so he went back on short-term disability.  AR83-84.  He testified that both the Esurance job and his prior jobs at Wells Fargo and Cigna were incoming calls, customer service desk jobs that did not require much lifting.  AR85-86.

Mr. Springer testified that he tried to get call center jobs with more talking due to his disability from his cerebral palsy.  AR86.  He explained the first he tried was at Pizza Hut, but he did not have the needed hand dexterity to perform that type of work.  AR86.  Mr. Springer testified that he had recent

additional symptoms from his cerebral palsy including his right knee randomly giving out, and his left hip giving out. AR104.

When asked why he stopped working at Esurance, Mr. Springer testified that he was not focused on his sales job at Esurance because his mom had leukemia and he wanted to be with her at the hospital. AR87. He had some attendance issues and was not meeting his sales stats at Esurance. AR87-88. He transferred from Esurance sales side to the Esurance DriveSense department because it was a better fit. AR87-88. He asked his DriveSense manager if he could work at home, and his manager approved it. AR88. Esurance merged with another department and the new manager would not let him work from home. AR88. He told the new manager he was more comfortable working at home because of the social anxiety and depression, but the new manager would not let him work from home. AR88. He talked to his doctor about the situation and that is when he started the short-term disability through the insurance of Esurance. AR88-89.

Mr. Springer testified that his depression reduced his motivation, that he had constant fatigue, and that he had problems staying awake and was taking caffeine pills to stay awake at appointments. AR89. Mr. Springer said he shopped at Wal-Mart at 2:00 to 3:00 a.m. to avoid people due to his anxiety. AR90. Mr. Springer testified he had problems with his memory, concentration and focus. AR92.

Mr. Springer testified he was no longer taking medication for his mental impairments because he had lost his insurance. AR94. Mr. Springer also

testified that he started going to the community health clinic, but they would not prescribe the medications until he saw a psychologist, and there was a six to eight week wait time to be seen. AR94. Mr. Springer testified, "so I just kind of – procrastination that I haven't, and also finances that I haven't made regular appointments right now." AR94. He said he tried counseling a couple times in the past, but it ended when he lost his insurance and due to high co-pays. AR94.

Mr. Springer testified his daily activities consist of looking at Facebook or other websites on the internet, playing video games, watching something on YouTube or Netflix, reading a book, going to the grocery store usually once a week, driving usually at night, doing laundry, washing dishes, getting rid of trash, taking care of his two companion animal cats, and cleaning the litter box. AR98-100.

Mr. Springer testified that working out of his house was not related to any symptoms he was having. AR102. Mr. Springer testified that he worked out of his house because he had the opportunity to work from home, that it was something he wanted to try, and that he loved it. AR102-03.

### 2. Vocational Expert Testimony

The ALJ asked the VE a hypothetical that incorporated the limitations defined in the RFC, except the need for hourly bathroom breaks and the VE testified the individual would not be able to perform Mr. Springer's past work, but could perform the occupations of copy machine operator, DOT# 207.685-014, light work, with 49,000 jobs available nationally; mail clerk,

DOT# 209.687-026, light work, with 55,000 jobs available nationally; and clerical checker, DOT# 222.687-010, light work, with 68,000 jobs available nationally. AR109-10.

The ALJ then added an additional limitation that the individual was "going to need hourly bathroom breaks lasting up to five minutes in duration." AR110. The VE testified, "I believe with just five minutes every hour for a bathroom break, that would fit those three jobs." AR110. The VE also testified that an individual could be off task throughout the day up to 15% of the time for additional breaks or other reasons and maintain their job. AR110.

### 3. Other Evidence

A letter from Sedgwick Claims Management (Sedgwick) documents that Mr. Springer was on short-term disability leave from work from October 12, 2015, to October 26, 2015, and from November 12, 2015, to January 29, 2016, following 7-day waiting periods, and he was on FMLA leave. AR177. His disability was then denied effective January 30, 2016, and he was advised to return to work. AR177. The letter from Sedgwick states there were no objective findings to support the severity of Mr. Springer's condition and an inability to perform his job duties, and there was no medical information to suggest that he was unable to perform the necessary functions of his job position. AR178. Esurance terminated Mr. Springer's employment on March 15, 2016, because Mr. Springer stopped notifying Esurance of his absences since February 19, 2016. AR180.

In a disability report, Mr. Springer reported that his weight gain had made it harder to dress and to bend his limbs, but he had no problem with bathing, caring for his hair, shaving, feeding himself, or using the toilet. AR257. Mr. Springer stated he did not need reminders to take care of his personal grooming or to take medicine. AR258. Mr. Springer reported that he prepares his own meals daily, cleans the apartment, washes dishes, does laundry, drives a car, and shops for food and clothes. AR258-59. Mr. Springer reported he is able to pay bills, count change, handle a savings account, and use a checkbook. AR259. In another report, Mr. Springer stated weight gain had caused him to get winded easier, and his limbs and feet hurt. AR261. Mr. Springer reported he is left handed. AR261. In a disability report, Mr. Springer reported that he lacked hand/eye coordination, and his cerebral palsy affects his right side with a lack of muscle strength and dexterity, restricts his movement and options, and he is slower.

**F.   Disputed Facts**

1.      In Step 3 the ALJ did not state in his decision that he considered Listing 12.08, for Mr. Springer's Personality Disorder. AR14-15.

2.      Mr. Springer submitted additional evidence to the Appeals Council regarding Post-Impairment Syndrome which is a syndrome caused by the motor issues initially caused by cerebral palsy, but then impacts individuals as they age after years of moving in non-optimal ways and living with spastic muscles. AR34-37. Common symptoms of Post-Impairment Syndrome are

arthritis pain, weakness, fatigue, and depression. AR38-40. Defendant

disputes this fact because it is an excerpt from a web site and not evidence.

## DISCUSSION

**A. Standard of Review**

When reviewing a denial of benefits, the court will uphold the

Commissioner's final decision if it is supported by substantial evidence on the

record as a whole. 42 U.S.C. § 405(g); <u>Minor v. Astrue</u>, 574 F.3d 625, 627 (8th

Cir. 2009). Substantial evidence is defined as more than a mere scintilla, less

than a preponderance, and that which a reasonable mind might accept as

adequate to support the Commissioner's conclusion. <u>Richardson v. Perales</u>,

402 U.S. 389, 401 (1971); <u>Klug v. Weinberger</u>, 514 F.2d 423, 425

(8th Cir. 1975). "This review is more than a search of the record for evidence

supporting the [Commissioner's] findings, and requires a scrutinizing analysis,

not merely a rubber stamp of the [Commissioner's] action." <u>Scott ex rel. Scott</u>

<u>v. Astrue</u>, 529 F.3d 818, 821 (8th Cir. 2008) (cleaned up).

In assessing the substantiality of the evidence, the evidence that detracts

from the Commissioner's decision must be considered, along with the evidence

supporting it. <u>Minor</u>, 574 F.3d at 627. The Commissioner's decision may not

be reversed merely because substantial evidence would have supported an

opposite decision. <u>Woolf v. Shalala</u> 3 F.3d 1210, 1213 (8th Cir. 1993); <u>Reed v.</u>

<u>Barnhart</u>, 399 F.3d 917, 920 (8th Cir. 2005). If it is possible to draw two

inconsistent positions from the evidence and one of those positions represents

the Commissioner's findings, the Commissioner must be affirmed. <u>Oberst v.</u>

Shalala, 2 F.3d 249, 250 (8th Cir. 1993). "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." Mittlestedt v. Apfel, 204 F.3d 847, 851 (8th Cir. 2000)(citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed. Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g). Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis. Erroneous interpretations of law will be reversed. Walker v. Apfel, 141 F.3d 852, 853 (8th Cir. 1998)(citations omitted). The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court. Smith, 982 F.2d at 311.

**B.    The Disability Determination and the Five-Step Procedure**

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The ALJ applies a five-step procedure to decide whether an applicant is disabled. This sequential analysis is mandatory for all SSI and SSD/DIB

applications.  <u>Smith v. Shalala</u>, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R.

§ 404.1520.  The five steps are as follows:

> **Step One**:  Determine whether the applicant is presently engaged
> in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the
> applicant is engaged in substantial gainful activity, he is not
> disabled and the inquiry ends at this step.

> **Step Two**: Determine whether the applicant has an impairment or
> combination of impairments that are *severe*, i.e. whether any of the
> applicant's impairments or combination of impairments
> significantly limit his physical or mental ability to do basic work
> activities.  20 C.F.R. § 404.1520(c).  If there is no such impairment
> or combination of impairments the applicant is not disabled and
> the inquiry ends at this step. NOTE: the regulations prescribe a
> special procedure for analyzing mental impairments to determine
> whether they are severe.  <u>Browning v. Sullivan</u>, 958 F.2d 817, 821
> (8th Cir. 1992); 20 C.F.R. § 1520a.  This special procedure
> includes completion of a Psychiatric Review Technique Form
> (PRTF).

> **Step Three**: Determine whether any of the severe impairments
> identified in Step Two meets or equals a "Listing" in Appendix 1,
> Subpart P, Part 404.  20 C.F.R. § 404.1520(d).  If an impairment
> meets or equals a Listing, the applicant will be considered disabled
> without further inquiry.  <u>Bartlett v. Heckler</u>, 777 F.2d 1318, 1320
> n.2 (8th Cir. 1985).  This is because the regulations recognize the
> "Listed" impairments are so severe that they prevent a person from
> pursuing any gainful work.  <u>Heckler v. Campbell</u>, 461 U.S. 458,
> 460, (1983).  If the applicant's impairment(s) are *severe* but do not
> meet or equal a *Listed impairment* the ALJ must proceed to step
> four.  NOTE: The "special procedure" for mental impairments also
> applies to determine whether a severe mental impairment meets or
> equals a Listing.  20 C.F.R. § 1520a(c)(2).

> **Step Four**: Determine whether the applicant is capable of
> performing past relevant work (PRW).  To make this determination,
> the ALJ considers the limiting effects of all the applicant's
> impairments, (even those that are not *severe)* to determine the
> applicant's residual functional capacity (RFC).  If the applicant's
> RFC allows him to meet the physical and mental demands of his
> past work, he is not disabled.  20 C.F.R. §§ 404.1520(e);
> 404.1545(e).  If the applicant's RFC does not allow him to meet the

physical and mental demands of his past work, the ALJ must proceed to Step Five.

**Step Five**: Determine whether any substantial gainful activity exists in the national economy which the applicant can perform. To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience. 20 C.F.R. § 1520(f).

## C.    Burden of Proof

The plaintiff bears the burden of proof at steps one through four of the five-step inquiry. Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994); Mittlestedt, 204 F.3d at 852; 20 C.F.R. § 404.1512(a). The burden of proof shifts to the Commissioner at step five. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Clark v. Shalala, 28 F.3d 828, 830 (8th Cir. 1994). "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices." Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999). The burden shifting is "a long standing judicial gloss on the Social Security Act." Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987). Moreover, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five." Stormo v. Barnhart 377 F.3d 801, 806 (8th Cir. 2004).

## D.    The Parties' Positions

Mr. Springer asserts the Commissioner erred in three ways: (1) the Commissioner failed to properly identify all of Mr. Springer's severe impairments; (2) the Commissioner's determination of Mr. Springer's RFC is

not supported by substantial evidence[4]; and (3) the Commissioner's Step 5 finding that there is a significant number of occupations Mr. Springer can perform is not supported by substantial evidence.[5]  The Commissioner asserts the ALJ's decision is supported by substantial evidence in the record and the decision should be affirmed.

**E.    Analysis**

Mr. Springer's assignments of error are discussed in turn below.

**1.    Whether the Commissioner Properly Identified All of Mr. Springer's Severe Impairments.**

The ALJ identified the following medically determinable severe impairments:  (1) cerebral palsy with right spastic hemiparesis; (2) generalized anxiety disorder; (3) major depressive disorder; (4) personality disorder; (5) panic disorder; and (6) social anxiety disorder.  The ALJ identified the following medically determinable but non-severe impairments:  (1) urinary frequency;  (2) deviated septum resulting in sleep apnea/insomnia; (3) hypertension; and (4) obesity.

Mr. Springer asserts the ALJ should have categorized his urinary impairment and his obesity as severe impairments rather than non-severe impairments. At step two, it is the claimant's burden to demonstrate a (1) severe (2) medically determinable impairment, but the burden is not difficult to meet and any doubt about whether the claimant met her burden is resolved in favor of the claimant.  <u>Kirby v. Astrue</u>, 500 F.3d 705, 707 (8th Cir. 2007);

---

[4] This assignment of error contains two subparts.
[5] This assignment of error also contains two subparts.

Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001); Quinn v. Berryhill, 2018 WL 1401807 *5 (D.S.D. Mar. 20, 2018); and Dewald v. Astrue, 590 F. Supp. 2d 1184, 1199 (D.S.D. 2008) (citing SSR 85-28)).

An impairment is "medically determinable" if it results from "anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques." See 20 C.F.R. § 404.1521. "Therefore, a physical or mental impairment must be established by objective medical evidence from an acceptable medical source." Id. If an impairment is medically determinable, then the Commissioner next considers whether it is severe. Id.

An impairment is not severe if it does not significantly limit the claimant's physical or mental ability to do basic work activities.[6] See 20 C.F.R. § 404.1522(a). Basic work activities include, but are not limited to: walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, use of judgment; responding appropriately to supervisors and co-workers and usual work situations, dealing with changes in a routine work setting, and understanding, carrying out, and remembering simple instructions. Id. at (b). At step two only medical evidence is evaluated to assess the effects of an impairment on the ability to perform basic work

---

[6] Paradoxically, the Commissioner's regulations do not define "severe," but rather define what is "not severe." The inference from the regulation is that a severe impairment *does* significantly limit a claimant's physical or mental ability to do basic work activities.

activities.  <u>See</u> SSR 85-28.  Therefore, subjective complaints by the claimant
are not part of the step two analysis.  <u>Id</u>.

### a. urinary frequency

The ALJ found Mr. Springer had a medically determinable impairment of
urinary frequency, but that it was non-severe because Mr. Springer's treatment
record dated March, 2016, indicated Mr. Springer had "good" bowel and
bladder control and that after that date, Mr. Springer sought no further specific
treatment for the condition.  AR13, citing to AR354.  The ALJ cited to a
neurologist's note (AR354) who was treating Mr. Springer for his sleep apnea
issues in support of this conclusion.  <u>Id.</u>  Mr. Springer asserts it was error to
rely on this treatment note to conclude his urinary frequency impairment was
not severe, because urinary frequency was not the purpose of this medical
visit, nor was that issue even specifically addressed during this medical
consult.  Instead, the comment "good bowel and bladder control" was simply
listed under the "review of systems" section of the medical note.  <u>Id.</u>

Mr. Springer asserts his urinary frequency problem should have been
identified as a severe impairment, citing a citation to a printout from a website
he provided to the Appeals Council.  <u>See</u> AR34-75.  It appears this document
was made a part of the administrative record, but was not officially marked as
evidence which was formally considered by the Appeals Council.  <u>See</u> AR4-5
(listing Exhibits which were considered by the Appeals Council).  The website
explains persons with cerebral palsy have a higher incidence than others of
incontinence, and it is a condition often associated with cerebral palsy.  The

website also states surgery is an option to correct such incontinence. AR66. The website speaks in generalities. Id.

Mr. Springer never specifically alleges *he* suffers from incontinence. Mr. Springer never sought medical treatment for this condition. Nor does he claim that any of his medical providers have recommended he undergo a surgical treatment for incontinence. Further, Mr. Springer did not list incontinence or any form of urinary difficulty as an impairment in his disability application (AR184-90; 255), or in his supporting function report (AR255-263).

Next, Mr. Springer criticizes the ALJ for failing to categorize his "urinary frequency" as a severe impairment, because the ALJ inserted into the RFC Mr. Springer's alleged limitation of the need for a "bathroom break" once per hour. AR16. This limitation was not imposed by any physician. Indeed, neither the ALJ in its decision nor Mr. Springer in his argument to this court cite any medical opinion or evidence in support of the notion that Mr. Springer has a medically determinable impairment (mild or severe) regarding urinary frequency or incontinence.

The ALJ appears to have inserted the hourly bathroom break limitation based solely upon Mr. Springer's hearing testimony (AR95) about his need for hourly bathroom breaks, which Mr. Springer attributed to a side effect of the diuretic medication he took for his blood pressure. Id. Mr. Springer estimated that because of his medication (not his cerebral palsy) he could not work at a call center because he approximated his need to use the bathroom at once per hour. Id.

Mr. Springer cites SSR 96-9p in support of the proposition that to be successful in sedentary jobs, an individual will be expected to able to remain seated at their work station with no more than their morning break, afternoon break, and lunch break—at approximately "2-hour intervals." See SSR 96-9p at POLICY INTERPRETATION—Guidelines for Evaluating the Ability to Do Less Than a Full Range of Sedentary Work—Exertional and Non-Exertional Limitations and Restrictions—Sitting.

Later in his hearing testimony, however, upon examination by his own representative, Mr. Springer conceded that when he did work at the call center, the two daily provided breaks plus lunch were sufficient for his bathroom needs. AR106. Though the ALJ's hypothetical and ultimate RFC which imposes a limitation of the need to take an hourly bathroom break may be inconsistent with SSR 96-9p, Mr. Springer's own testimony about his abilities *is* consistent with the requirement. The court can discern no error in the ALJ's failure to designate Mr. Springer's alleged urinary frequency as a severe impairment.

### b. obesity

The ALJ also determined Mr. Springer's medically determinable obesity was a mild impairment. AR14. The ALJ's discussion regarding Mr. Springer's obesity is repeated in its entirety below:

> The undersigned has considered the effects of the claimant's obesity and its possible limitation of function in accordance with the requirements of SSR 02-01p. Medical records show that the claimant has a body mass index (BMI) ranging from 37.3 to 40.3. Exh. 1F, p. 10; Exh. 6F, p. 7. This meets the criteria of morbid obesity in the National Institutes of Health's CLINICAL GUIDELINES ON

THE IDENTIFICATION, EVALUATION, AND TREATMENT OF OVERWEIGHT AND OBESITY IN ADULTS (NIH Publication No. 98-4083, September, 1998). However, there is no persuasive evidence that the claimant's obesity significantly affects or exacerbates his physical impairment. The claimant has not undergone any special treatment for weight loss (such as consideration for bariatric surgery) and indeed, does not make any significant allegations that his weight causes, or contributes to, any degree of functional limitation. Therefore, the undersigned concludes that the claimant's obesity is not a severe impairment.

See AR14. Mr. Springer asserts this analysis is insufficient, stating the ALJ failed to conduct the individualized assessment mandated by SSR 02-01p.[7]

Mr. Springer asserts the ALJ insufficiently considered his obesity because though the ALJ acknowledged the obesity, it never mentioned the combined effect of the obesity and Mr. Springer's cerebral palsy or the effect his obesity had upon, for example, his sleep apnea condition. This is especially true, Mr. Springer argues, given the fact that Mr. Springer's proposed jobs (copy machine operator, mail clerk, and clerical checker) were more physically demanding than his past relevant work (telephone customer clerk and statistical report clerk). Springer asserts the ALJ's rationalization that he had not asserted his weight caused functional limitations is not accurate.

---

[7] The court notes that SSR 02-1p was rescinded and replaced with SSR 19-2p. However, SSR 19-2p explains the SSA began using that regulation on its effective date (May 20, 2019), and that for all Social Security disability applications filed on or before May 20, 2019, the old regulation (SSR 02-01p), continued to apply. The replacement SSR (19-2p) explains, however, that for cases that are remanded after its effective date, "we will apply this SSR to the entire period at issue in the decision we make after the court's remand." SSR 19-2p will therefore apply on remand in this case.

The court notes that in his initial disability report, Mr. Springer did not list obesity as one of the medical conditions that limited his ability to work. AR221.[8] The SSA's own regulations make clear that the claimant bears the burden to inform the ALJ of all of his impairments. See 20 C.F.R. § 404.1512(a)(1). That regulation states in relevant part, "In general, you have to prove to us that you are . . . disabled. . . We will consider only impairments you say you have or about which we receive evidence." Id. The Commissioner asserts in this case that the ALJ fulfilled its duty by including the above-quoted discussion about Mr. Springer's obesity in its decision, because Mr. Springer never even cited obesity as one of the medical conditions which affected his ability to work in the first instance.

The claimant alleging the medical condition is only the first half of the equation, however. The ALJ is also required to consider medical conditions "about which [it] receives evidence." See 20 C.F.R. § 404.1512(a)(1). Through the evidence received into the record, the ALJ clearly recognized obesity was an issue in Mr. Springer's case, because the ALJ discussed the issue *sua sponte* in its written decision. And Mr. Springer did explain in his function report that his weight made it difficult to dress and bend, made him become winded more easily, and made his limbs and feet hurt, and that he had sleep apnea. AR257-61. Additionally, Mr. Springer argues he had not engaged in physically demanding work for many years, so he would not necessarily have been able to

---

[8] Mr. Springer listed social anxiety, depression, stress, sleep apnea, dizzy spells, high blood pressure, lack of focus, short term/long term memory loss, and cerebral palsy as the conditions which limited his ability to work. AR221.

predict known how his obesity might affect his work abilities.  See Docket 17, p. 6.

Because the ALJ clearly recognized there was evidence in the record to support a medically determinable impairment of obesity, the ALJ was required to follow the directives of SSR 02-01p to determine whether obesity is a severe or non-severe impairment.

SSR 02-02p explains how to determine the severity of obesity as a medically determinable impairment  at POLICY INTERPRETATION: General: Sequential Evaluation: Step 2: Severe Impairment: ¶ 6: When is Obesity a "Severe" Impairment?  This portion of SSR 02-01p instructs that, as with any other medically determinable impairment, the ALJ should examine whether the claimant's obesity, alone or in combination with another medically determinable impairment,  significantly limits the claimant's ability to do basic work activities.  Id.  The ALJ should also consider whether the effects of any symptoms such as pain or fatigue limit functioning.  Id.  Therefore, obesity is considered "not severe" only if it is a slight abnormality that has no more than a minimal effect on the claimant's ability to do basic work activities.  Id. Finally, there is no specific level of weight or BMI that equates with a "severe" or "not severe" impairment (i.e. "extreme" or "morbid" obesity).  Instead, the ALJ should conduct an individualized assessment of the impact of obesity on the claimant's *functioning* when deciding whether the impairment is severe. Id. (emphasis added).

The above directive is compared to the ALJ's discussion about whether Mr. Springer's obesity met the definition of a severe impairment. When this comparison is made, it becomes apparent that the ALJ's analysis bears little resemblance to the analysis required by SSR 02-01p. First, the ALJ stated Mr. Springer's obesity fell into the category of "morbid," a finding the SSR explicitly states is not determinative.

Next, the ALJ stated there is no persuasive evidence that the claimant's obesity significantly affects or exacerbates his physical impairment because he had not undergone any particular treatment for his weight, such as bariatric surgery. But SSR 02-01p does not suggest bariatric surgery or any other form of treatment is an appropriate consideration in determining whether obesity is a severe or non-severe medical impairment. Next, the ALJ stated Mr. Springer had not made any allegations that his weight causes or contributes to any degree to any functional limitation. This portion of the ALJ's justification for failing to deem Mr. Springer's obesity severe is simply incorrect. Though he did not specify it contributed to limiting his work function, Mr. Springer stated in his disability function report that his weight gain caused him to become winded more easily, to make limbs and feet hurt, and that he had sleep apnea. AR261. He also explained his weight made it harder to bend his limbs. AR257. These statements of limitation apply to Mr. Springer's functioning whether in activities of daily living or a work setting. The court concludes remand is appropriate for further consideration of whether Mr. Springer's obesity is a severe impairment.

**2.      Whether the Commissioner's Determination of Mr. Springer's RFC Is Supported by Substantial Evidence.**

Residual functional capacity is "defined as what the claimant can still do despite his or her physical or mental limitations."  Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001) (citations omitted, punctuation altered).   "The RFC assessment is an indication of what the claimant can do on a 'regular and continuing basis' given the claimant's disability.  20 C.F.R. § 404.1545(b)." Cooks v. Colvin, 2013 WL 5728547 at *6 (D.S.D. Oct. 22, 2013).  The formulation of the RFC has been described as "probably the most important issue" in a Social Security case.  McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982), abrogation on other grounds recognized in Higgins v. Apfel, 222 F.3d 504 (8th Cir. 2000).

When determining the RFC, the ALJ must consider all a claimant's mental and physical impairments in combination, including those impairments that are severe and those that are not severe.  Lauer, 245 F.3d at 703; Social Security Ruling (SSR) 96-8p 1996 WL 374184 (July 2, 1996).  Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on *all* the relevant evidence . . . a claimant's residual functional capacity is a medical question."[9]  Lauer, 245 F.3d at 703 (citations

---

[9] Relevant evidence includes:  medical history; medical signs and laboratory findings; the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication); reports of daily activities; lay evidence; recorded observations; medical source statements; effects of symptoms, including pain, that are reasonably attributable to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations.  See SSR 96-8p.

omitted) (emphasis added). Therefore, "[s]ome medical evidence must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace." Id. (citations omitted).

"The RFC assessment must always consider and address medical source opinions." SSR 96-8p. If the ALJ's assessment of RFC conflicts with the opinion of a medical source, the ALJ "must explain why the [medical source] opinion was not adopted." Id. "Medical opinions from treating sources about the nature and severity of an individual's impairment(s) are entitled to special significance and may be entitled to controlling weight. If a treating source's medical opinion on an issue of the nature and severity of an individual's impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, the [ALJ] must give it controlling weight." Id.

Ultimate issues such as RFC, "disabled," or "unable to work" are issues reserved to the ALJ. Id. at n. 8. Medical source opinions on these ultimate issues must still be considered by the ALJ in making these determinations. Id. However, the ALJ is not required to give such opinions special significance because they were rendered by a treating medical source. Id.

"Where there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that

functional capacity." SSR 96-8p. However, the ALJ "must make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." Id.

When writing its opinion, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence. . . In assessing RFC, the adjudicator must . . . explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." Id.

"[T]o find that a claimant has the [RFC] to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Reed, 399 F.3d at 923 (citations omitted, punctuation altered); SSR 96-8p 1996 WL 374184 ("RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis" for "8 hours a day, for 5 days a week, or an equivalent work schedule.").

While it is true that the ALJ is free to formulate the RFC from all the evidence including the opinion evidence and the medical records, it is also established law that the ALJ may not substitute its own opinions for those of the physician. Finch v. Astrue, 547 F.3d 933, 938 (8th Cir. 2008), nor may the ALJ "play doctor" or rely on its own interpretation of the meaning of the medical records. Pate-Fires v. Astrue, 564 F.3d 935, 946-47 (8th Cir. 2009).

These principles were recently reaffirmed in Combs v. Berryhill, 878 F.3d 642, 647 (8th Cir. 2017). In Combs, the claimant alleged disability as a result of combined impairments of rheumatoid arthritis, osteoarthritis, asthma, and obesity. Id. at 643. The only medical opinions in the file regarding Ms. Combs' RFC were from two State agency physicians who had never treated or examined Ms. Combs. Id. at 644. Those physicians instead based their opinions on their review of Ms. Combs' medical records. They gave differing opinions as to Ms. Combs' RFC (one opined she was capable of light duty work, while the other opined she was capable of only sedentary work). Id. at 645.

In deciding which opinion to credit, the ALJ found Ms. Combs' subjective complaints not entirely credible based upon the ALJ's own review of her medical records and notations therein which indicated she was in "no acute distress" and that she had "normal movement of all extremities." Id. The State agency physicians apparently did not base their opinions on these observations. Ms. Combs asserted the ALJ should have contacted the physicians for clarification of what the notations meant rather than rely upon its own inferences. Id. at 646.

The Eighth Circuit agreed, concluding the ALJ erred by relying on its own inferences as to the relevance of the two phrases "no acute distress" and "normal movement of all extremities" as it was significant to her conditions. Id. at 647. The court found the relevance of these medical terms was not clear in terms of Ms. Combs' ability to function in the workplace, because her medical providers also consistently noted in their treatment records that she was had

47

rheumatoid arthritis, prescribed medication for severe pain, and noted trigger point and joint pain with range of motion. Id. So, by relying on its own interpretation of "no acute distress" and "normal movement of all extremities," in terms of Ms. Combs' RFC, the ALJ failed to fulfill his duty to fully develop the record. Id.

Additionally, SSR 96-8p instructs ALJs how to determine RFC and how to explain their determinations. That ruling contains requirements for the ALJ's narrative discussion. One of those requirements is that the RFC assessment must "include a resolution of any inconsistencies in the evidence as a whole . . ." Id. at p. 13. Another is that "[t]he RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." Id. at p. 14.

The ALJ formulated Mr. Springer's RFC as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that the claimant can lift and carry up to 20 pounds occasionally and 10 pounds frequently; can sit for six hours in an eight-hour day; can occasionally push and pull with the right upper and lower extremity; can occasionally climb ramps and stairs, can never climb ladders or scaffolds, can occasionally balance, stoop, kneel, crouch and crawl, can frequently reach (both overhead and all other directions) with the right upper extremity; and can frequently handle, finger, and feel with the right hand. The claimant cannot tolerate exposure to unprotected heights or moving mechanical parts. The claimant would need hourly bathroom breaks lasting five minutes in duration. Finally, the claimant is capable of only simple, routine tasks, with simple, work-related decisions, and occasional interactions with supervisors, co-workers, and the general public.

48

AR16.  Mr. Springer asserts the ALJ's formulation of his RFC was not supported by substantial evidence for two reasons, discussed below.

### a. Whether the Commissioner Properly Determined the Limitations from Mr. Springer's Cerebral Palsy.

Mr. Springer's first criticism of the manner in which the ALJ formulated the RFC is the ALJ's failure to properly account for the physical limitations presented by Mr. Springer's cerebral palsy.  Mr. Springer argues that though the ALJ accepted cerebral palsy as a severe medically determinable impairment—including its right-sided hemiparesis--the ALJ rejected every medical opinion in the file as to the actual physical limitations his cerebral palsy imposed.

Instead, Mr. Springer argues, the ALJ improperly interpreted the medical evidence in the record to draw its own conclusions about the physical limitations presented by cerebral palsy.  This, Mr. Springer argues, the ALJ was not allowed to do.  The specific physical limitations which Mr. Springer cites as improperly inferred by the ALJ are:  the ability to lift up to 20 pounds up to one third of the day (including with his right hand/arm ); lifting up to ten pounds two-thirds of the day, (including with his right hand/arm);  and frequently (up to two-thirds of the day) (including with his right hand/arm) reaching, handling, fingering and feeling.

The ALJ also determined, however, that Mr. Springer could only *occasionally* push and pull with his right arm and right leg.  Mr. Springer observes the ALJ did not explain why it limited Mr. Springer to only *occasionally* pushing and pulling with his right arm, while determining

49

Mr. Springer is capable of *frequent* reaching, lifting, carrying, handling, and fingering with the same extremity.

The State agency physicians (doctors Gregory Erickson at the initial level and Gregory Stevens on reconsideration) found Mr. Springer capable of working at the medium duty level. AR 120-21; 133-37.[10] In other words, they found Mr. Springer could occasionally lift 25 pounds and frequently lift 20 pounds, and that he had no manipulative limitations. Id. These physicians did limit Mr. Springer to occasional pushing or pulling with the right upper and lower extremities because of his right cerebral palsy with right spastic hemiparesis. Id. They also limited Mr. Springer to postural limitations of frequent balancing, kneeling, crouching and crawling, and occasional climbing of ramps, stairs, ladders, ropes, and scaffolds, and to avoid even moderate exposure to hazards such as machinery and heights. Id.

The ALJ gave only "partial" weight to these State agency physician opinions, because the ALJ acknowledged ongoing exam abnormalities regarding Mr. Springer's right upper extremity supported a greater degree of limitation. AR21. The ALJ considered, but gave "little" weight to the opinions of each of Mr. Springer's treating physicians. See AR19-21 (giving "little" weight to the opinions of Drs. Meyer, Bannwarth, Price, and Kamstra).

_____

[10] In its decision, the ALJ mistakenly stated the State agency physicians found Mr. Springer capable of working at the light duty level. See AR21. This is incorrect because the lifting abilities assigned by Drs. Erickson and Stevens (20 pounds frequently and 25 pounds occasionally) are beyond the limits of those required for light-duty work. The lifting limits for light-duty work are 10 pounds frequently and 20 pounds occasionally. See 20 C.F.R. § 404.1567(b).

Because the ALJ gave only "partial" weight to the State agency physicians'

opinions, and gave "little" weight to the opinions of his treating physicians,

Mr. Springer asserts the only way the ALJ could have formulated his RFC is by

drawing its own inferences from the medical records.

For example, Mr. Springer's brain MRI documented abnormalities

consistent with Mr. Springer's cerebral palsy.  See AR367; 354; 393; 408.  The

medical records regarding this MRI state as follows:

> MRI of the brain on January 6, 2016, without contrast showed loss
> of white matter within the left frontoparietal region with ex vacuo
> dilation of the left lateral ventricle suggestive of chronic changes
> probably due to an old ischemic insult in that region, otherwise
> MRI being negative." AR 354.  Patient's MRI showed his cerebral
> palsy but nothing acute." AR367.  FINDINGS: There is loss of
> white matter adjacent to the posterior atrium of the left lateral
> ventricle.  The appearance suggests old ischemic change.  I do not
> see evidence of midline shift, neoplasm, hemorrhage, acute infarct
> or hydrocephalus.  Flow void is seen within intercranial vertebral,
> basilar, and carotid arteries.  There is mild mucosal thickening
> within the sphenoid sinus.  The remainder of the paranasal
> sinuses appears clear.  The middle ears and mastoid air cells
> appear clear.  IMPRESSION: There is a loss of white matter in the
> left frontoparietal region associated with ex vacuo dilation of the
> left lateral ventricle.  The appearance suggests chronic changes
> possibly old ischemic change in the region.  The MRI of the brain
> otherwise appears unremarkable.  An acute process is not
> identified.  Incidental note is made of mild mucosal thickening
> within the sphenoid sinus. AR393.  This same note appears at
> AR408.

The ALJ had this to say about Mr. Springer's medical records and their

relationship to Mr. Springer's physical capabilities:

> A January 2016 MRI of the brain revealed dilation of the left
> ventricle with ischemic changes, consistent with cerebral palsy . . .
> These findings may account for the claimant's right-sided
> symptoms.  However, the mere presence of objective abnormalities
> does not, in and of itself, equate to any specific functional
> limitation, nor does not necessarily indicate the frequency or

severity of symptoms caused by the abnormalities. Therefore, these objective findings are only partially consistent with the claimant's allegations of disabling symptomology. The claimant's exam findings do not support the presence of disabling limitations. Exams have revealed a boutonniere-type deformity of the right hand; spasticity, weakness and immobility of the right hand, atrophy of the right upper and lower extremities; hemi-paretic gait; right spastic hemiparesis; 4-5 right foot strength; and hyperreflexia in the right lower extremity. These findings are consistent with some degree of difficulty lifting and carrying heavy objects, engaging in constant postural activity with the right upper and lower extremity. However, the claimant's exams have also revealed normal strength, stable gait, normal sensation, and normal range of motion. These findings demonstrate sufficient strength to lift and carry up to 20 pounds occasionally; occasionally push and pull with the right upper and lower extremity; frequently handle, reach and feel, and reach in all directions with the right arm; and occasionally engage in most postural activity.

The claimant's treatment history is not consistent with the presence of disabling limitations. The claimant has sought treatment for his impairments. However, while he has sought some treatment for sleep apnea and hypertension, he does not require any treatment to manage his symptoms of cerebral palsy. He does not require any assistive devices. He does not use any braces. Therefore, while the claimant's treatment history is consistent with some degree of limitation, it is not consistent with a disabling degree of limitation.

AR17-18 (internal citations omitted). Mr. Springer asserts that because the ALJ did not cite to medical expert opinion evidence to support its conclusions, the only logical conclusion is that the ALJ made its own inferences as to how Mr. Springer's medical records translated into the physical restrictions the ALJ used to formulate the RFC. The court notes that though the ALJ cited to medical *records* within the above-cited paragraphs, it did not cite to any of the medical *opinion* evidence.

First, the ALJ cited to Dr. Kamstra's summary of the January, 2016, MRI, (EX 6F, p.5, or AR431) as stating Mr. Springer's brain revealed a dilation

of the left ventricle with ischemic changes which were "consistent with cerebral palsy." AR17. From this, the ALJ concluded that the MRI "may" account for Mr. Springer's right-sided symptoms but did not equate to any specific functional limitation nor did it necessarily indicate any specific frequency or severity of symptoms. Id. Therefore, the ALJ concluded, "these objective findings are only partially consistent with the claimant's allegations of disabling symptomology." Id.

The ALJ then cited EX 3F, pp. 3 and 24 (AR354 and 375). These are notes from Dr. Matos dated March, 2016 and November, 2015, which the ALJ noted described Mr. Springer's cerebral palsy and related hemiparesis, spasticity, boutonniere deformity of the right hand, atrophy of the right upper and lower extremities, hemi-paretic gait, right spastic hemiparesis, right foot strength, and hyperreflexia in the right lower extremity. From these medical records, the ALJ concluded Mr. Springer would have "some degree of difficulty lifting and carrying heavy objects, engaging in constant postural activity, or engaging in constant activity with the right upper and lower extremity." AR18.

But, the ALJ continued, Mr. Springer's "exams have also revealed normal strength, stable gait, normal sensation, and normal range of motion." Here, the ALJ cited to EX1F, p. 3, EX 3F, pp. 10 & 20, and EX 7F, p. 3. These citations are to the records dated December, 2015 and June, 2017, of Dr. Meyer (EX 1Fand 7F) and February, 2016, and December, 2015 notes of

Dr. Matos and Dr. Devevan[11] (EX 3F). From these medical records which the ALJ cited as recording normal strength, sensation, range of motion, and a stable gait, the ALJ concluded that Mr. Springer had "sufficient strength to lift and carry up to 20 pounds occasionally; occasionally push and pull with the right upper and lower extremity; frequently handle, reach, feel, and reach in all direction with the right arm; and occasionally engage in most postural activity." AR18. This conclusion was contrary to the only medical opinions in the file (the State agency physicians) who had offered any opinion at all about Mr. Springer's function-by-function capabilities.

The Commissioner asserts there was sufficient medical expert opinion to support the ALJ's formulation of the RFC, and the ALJ did not make its own inferences from the medical records. The Commissioner asserts the ALJ did not wholly reject the State agency opinions, but instead considered them, gave them "partial" weight, and considered "additional evidence which was not available" when the State agency physicians offered their opinions. Therefore, the Commissioner claims, the ALJ's formulation of Mr. Springer's RFC is appropriate and constitutes a resolution of conflicting evidence—which is exactly what an ALJ is supposed to do. Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007). And, the Commissioner asserts, it is the ALJ, not the

---

[11] The ALJ's note to EX 3F, p. 20 is to a medical record which references the draining of an abscess on Mr. Springer's chin. Under "review of systems" it is noted that Mr. Springer's cranial nerves II through XII are examined and normal. AR371.

physician, who maintains the ultimate responsibility to assess the claimant's RFC. Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007).

The State agency physicians rendered their opinions in July and September, 2016. Neither the Commissioner in his brief nor the ALJ in its decision specified exactly what other medical information that was not available to the State agency physicians before they rendered their opinions the ALJ relied upon to modify their findings.

It could not have been the actual MRI of Mr. Springer's brain, because that test was performed in January, 2016 and the State agency physicians referred to it in their opinions. See AR 131, 393. In its opinion, the ALJ stated it was "ongoing exam abnormalities" regarding Mr. Springer's right upper extremity that supported greater limitations than the Stage agency physicians envisioned. AR21. It is not logical to assume the ALJ was referring to the medical records wherein the ALJ noted normal strength, sensation, range of motion, and a stable gait, because these citations are all to "normal" findings. It is also not logical to assume the ALJ was referring to the other expert physician medical opinions which were offered after the State agency physicians offered their opinions (Doctors Bannwarth and Kamstra) because the ALJ gave *little* weight to these opinions, and as the ALJ noted, they did not assign any specific physical function-by-function limitations. AR20, 21. So what remains is the ALJ's reference to Dr. Matos' March, 2016 records, (which actually did exist before the State agency physicians rendered their opinions and the State agency physicians did refer to these records—see AR132).

55

Dr. Matos' records refer to Mr. Springer's cerebral palsy and related hemiparesis, spasticity, boutonniere deformity of the right hand, atrophy of the right upper and lower extremities, hemi-paretic gait, right spastic hemiparesis, right foot strength, and hyperreflexia in the right lower extremity. From these medical terms in the records then, the ALJ modified the Stage agency physical limitations to formulate Mr. Springer's RFC. Compare these terms to the medical terms which the Eighth Circuit Court of Appeals found in Combs to be inappropriate for a layman to infer medical meaning. The terms in Combs which the court found inappropriate for an ALJ to infer meaning were "no acute distress" and "normal movement of all extremities." Combs, 878 F.3d at 645. In Combs there was no evidence either of the State agency physicians had considered these terms in reaching their opinions, so the ALJ made its own inference as to the meaning of the medical terms. In this case, the ALJ went a step further by not only making its own inference, but also by disagreeing with the interpretation of the State agency physicians as to the physical restrictions which should appropriately correspond to Dr. Matos' records regarding Mr. Springer's cerebral palsy symptoms.

In brief, the Commissioner asserts the ALJ merely resolved the differences between the State Agency physicians and Mr. Springer's treating physicians. But this argument does not hold water. As the Commissioner aptly notes, none of Mr. Springer's treating physicians assigned (nor were they asked to assign) specific function-by-function restrictions. Not satisfied with the State agency physicians' inferences as to how the medical records should

56

be interpreted in this regard, and having no specific input from Mr. Springer's treating physicians, there is but one conclusion:  the ALJ interpreted the records differently from the only physicians who had offered any input at all on the subject in order to impose restrictions which were more significant than the State agency physicians.  An ALJ may choose between properly submitted medical opinions, but is not permitted to "set his own expertise against that of a physician who testified before him."  Combs, 878 F.3d 647; Strongson v. Barnhart, 361 F.3d 1066, 1070 (8th Cir. 2004); Nevland, 204 F.3d at 858; Gober v. Matthews, 574 F.2d 772, 777 (3d Cir. 1978)(the ALJ "may not simply draw his own inferences about plaintiff's functional ability from medical reports.").

Mr. Springer asserts that because the ALJ correctly recognized the State agency physicians' opinions regarding his physical capabilities were incorrect, and because his own treating physicians failed to assign any function-by-function limitations, the SSA's own regulations then imposed a duty to either recontact the treating physicians, request additional records, or order a consultative examination.  See 20 C.F.R. § 404.1520b.[12]

---

[12] Mr. Springer offers this court evidence which was never submitted to the ALJ or the appeals council.  See Docket 17-1.  He offers no "good cause" why this evidence was never presented to the agency in the first instance.  See Mouser v. Astrue, 545 F.3d 634, 637 (8th Cir. 2008).  Mr. Springer asserts this evidence represents the type of evidence the ALJ was duty bound to develop under 20 C.F.R. § 404.1520b.  He is free to make that argument to the agency on remand, but this court may not consider Docket 17-1 as substantive evidence at this stage of the proceedings.

The duty of the ALJ to develop the record—with or without counsel representing the claimant--is a widely recognized rule of long standing in social security cases:

> Normally in Anglo-American legal practice, courts rely on the rigors of the adversarial process to reveal the true facts of the case. However, social security hearings are non-adversarial. Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case. The ALJ's duty to develop the record extends even to cases like Snead's, where an attorney represented the claimant at the administrative hearing. The ALJ possess no interest in denying benefits and must act neutrally in developing the record.

Snead v. Barnhart, 360 F.3d 834, 838 (8th 2004) (citations omitted). See also Johnson v. Astrue, 627 F.3d 316, 319-20 (8th Cir. 2010) (ALJ has a duty to develop the record even when claimant has counsel). If the record is insufficient to determine whether the claimant is disabled, the ALJ must develop the record by seeking additional evidence or clarification. McCoy v. Astrue, 648 F.3d 605, 612 (8th Cir. 2011). However, this is true only for "crucial" issues. Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). The RFC is a "crucial" issue. McCoy, 683 F.2d at 1147. On remand, the ALJ should seek additional evidence pursuant to 20 C.F.R. § 404.1520b to clarify Mr. Springer's proper function-by function physical limitations.

**b.    Whether the Commissioner Properly Evaluated the Medical Evidence.**

Mr. Springer asserts the ALJ did not properly evaluate the medical evidence in the record. There were several medical opinions in the administrative record, including opinions from several of Mr. Springer's treating physicians and from the State agency non-examining, non-treating

58

physicians.  These opinions, and the weight the ALJ assigned to them, are

summarized below:[13]

> *State agency medical consultant Gregory Erickson, M.D.* offered his
> opinion at the initial level on July 21, 2016.  AR 120-21.
> Dr. Erickson solely reviewed records—he did not examine or treat
> Mr. Springer.  Dr. Erickson opined observed Mr. Springer had
> cerebral palsy but stated Mr. Springer was nevertheless capable of
> occasionally lifting 25 pounds and frequently lifting 20 pounds.
> Dr. Erickson indicated Mr. Springer had no manipulative
> limitations.  AR120-21.  Dr. Erickson limited Mr. Springer to
> occasional pushing or pulling with the right upper and lower
> extremities based upon Mr. Springer's cerebral palsy with right-
> sided hemiparesis.  AR120.  Dr. Erickson also imposed postural
> limitations of frequent balancing, kneeling, crouching, and
> crawling; occasional climbing ramps, stairs, ladders, ropes and
> scaffolds, and avoidance of even moderate exposure to hazards
> such as machinery and heights.  AR120-21.  Dr. Erickson assigned
> heavy weight to the neurology exam from March 28, 2016 (Dr.
> Matos, AR 354).  Dr. Erickson considered Mr. Springer's sleep
> apnea and high blood pressure were non-severe.  AR121.    The
> ALJ assigned Dr. Erickson's opinion **partial weight.**  The ALJ
> explained that while Dr. Erickson thoroughly reviewed the record
> and was highly qualified, and his opinions were generally
> consistent with Mr. Springer's exam findings, Mr. Springer's exam
> findings regarding his right upper extremity "support a greater
> degree of limitation on the use of that arm than envisioned by [this]
> physician."  AR21.

> *State agency medical consultant Gregory Stevens, M.D.* offered his
> opinion at the reconsideration level on September 27, 2016.  AR
> 133, 135-37.  His physical RFC was identical to Dr. Erickson's.
> Id.   The ALJ gave Dr. Stevens' opinion **partial weight** for the same
> reasons explained as to Dr. Erickson's opinion.  AR21.

> *State agency psychological consultant Robin Carter-Visscher, Ph.D.*
> offered her opinion at the initial level on July 23, 2016.  AR117-19.
> Dr. Carter-Visscher opined Mr. Springer had severe medically
> determinable impairments due to his cerebral palsy and anxiety
> disorder.  AR117.  She considered whether he also suffered from
> affective and personality disorders, but indicated there was

---

[13] This information is contained elsewhere in the opinion in scattered fashion
but is repeated here for ease of reference in discussing this assignment of error
by Mr. Springer.

insufficient evidence to evaluate the "B" and "C" criteria. The ALJ gave this opinion **little weight**. AR20. The ALJ explained the opinion was rendered "after a single review of the file." Id. While it was a "plausible" view of the file as it existed at the time, evidence subsequently submitted shows the Mr. Springer's attention problems and difficulty interacting with others—which show a greater degree of limitation in sustaining concentration and social interaction than endorsed by Dr. Carter-Visscher. Therefore, her opinion is "no longer consistent with the record." Id.

*State agency psychological consultant Alison Musso, Ph.D.* offered her opinion at the reconsideration level on September 28, 2016. AR132-39. Dr. Musso also determined Mr. Springer had a medically determinable impairment of severe anxiety disorder. AR133. She listed affective disorder as an impairment but apparently did not find it to be severe. Id. She found Mr. Springer had mild restrictions in activities of daily living; moderate restrictions in maintaining social functioning; and moderate restrictions in maintaining concentration, persistence or pace (the "B" criteria). She found the evidence did not establish the presence of the "C" criteria. AR133. She indicated Mr. Springer was capable of "low social, low stress environment," unskilled work. AR 139. The ALJ assigned this opinion **partial weight**. The ALJ explained this opinion was rendered after a thorough review of the file and was a reasonable interpretation of the file as it existed at the time of the review. AR21. Further, later-submitted evidence did not suggest any greater limitations. Id. However, the opinion used imprecise and vocationally useless terminology. Id.

*Treating physician Jeffrey Meyer, M.D.* rendered an opinion on November 16, 2015. AR376-77. Dr. Meyer saw Mr. Springer for anxiety, depression, and insomnia and completed paperwork for Mr. Springer stating that Mr. Springer should work from home. Id. The ALJ gave this opinion **little weight**. AR19. The ALJ explained that though Dr. Meyer was a treating physician, his opinion was "not consistent with claimant's mental status findings or the claimant's treatment history. Furthermore, the claimant's job at that time required significant interaction with the public." Id. The ALJ also explained "[t]his opinion does not speak to whether or how the claimant may be able to perform other types of work." Id.

*Treating psychologist, Thomas Price, Ph. D.* rendered an opinion on March 23, 2016. AR 335-50. Mr. Springer was referred to Dr. Price by treating physician Dr. Meyer. AR 335. Dr. Price conducted a psychological examination which consisted of a records review, behavioral observations, sleep-related screening,

functional impairment ratings, Barkley Deficits in Executive Functioning Scale, mental status exam, Montreal Cognitive Assessment, vocational history review, Occupational Stress Inventory, and personality testing (the MMPI-2), which was administered twice. AR335-50. Dr. Price noted Mr. Springer reported cerebral palsy which affected his right side but not his left side, and which did not affect his cognitive functioning. AR343. Mr. Springer denied going to the emergency room for mental health care and reported he had never received in-patient or residential mental health care, other than very limited counseling at Sanford Health. AR344. Dr. Price observed Mr. Springer was alert throughout the evaluation, but did appear sleepy at several points. AR336. Examination revealed a very flat affect, depressed mood, emotionally labile, easily agitated, and tense. AR336. Mr. Springer became more easily distracted as the evaluation proceeded. Id. He was given the Montreal Cognitive Assessment (MOCA) which indicated he had mild attention and memory-related difficulties. AR342. Mr. Springer was also given the Occupational Stress Inventory, which indicated significant problems in the workplace. AR346. The twice-repeated MMPI-2 test showed atypical and rarely-given responses. AR 347. Based on those results, Dr. Price noted Mr. Springer's clinical scale profile could be grossly over-elevated because of the severity if his psychopathology, and extreme plea for help, or deliberate malingering. AR347. Dr. Price concluded Mr. Springer's overstatements and possible exaggeration were too extreme for further interpretation and Mr. Springer's MMPI-2 profile was not further considered. AR347. Mr. Springer also completed the Millon Clinical Multiaxial Inventory—Third Edition (MCMI-III), designed to assess both clinical syndromes and personality patterns. AR347. Mr. Springer's MCMI-III response tendency scores indicated he magnified the level of experienced illness or characterological inclination to be self-pitying, and his Clinical Syndromes scale may be somewhat exaggerated, but standard scale modifications were used to account for his response style. AR347. The MCMI-III indicated Mr. Springer was experiencing major depression. AR347. Following the tests, Dr. Price diagnosed Mr. Springer with major depressive disorder, recurrent, severe, without psychotic features; generalized anxiety disorder; panic disorder with agoraphobia; personality disorder with avoidant and depressive personality traits; and complex sleep apnea. AR349. Dr. Price concluded Mr. Springer met the definition of disability given by his employer because his mental illness prevented him from performing one or more of the essential duties of his occupation. AR349. Dr. Price noted Mr. Springer's mental disorder had adversely impacted his ability to function in occupational and social settings, and that he was experiencing

lethargy, significant fatigue, daytime sleepiness, impatience, irritability, low tolerance for frustration, poor motivation, problems focusing his attention, difficulties with vigilance, problems processing information, problems remembering, lack of self-discipline, agitation and anxiety toward others,  and challenges to remain in social settings or interact with others. AR349.  Dr. Price observed Mr. Springer was inclined to perceive comments by others or their reactions in a negative way; he predicts he will not be treated well and has a tendency to react abruptly and in an irrational manner; he is easily annoyed; his mood shifts quickly; and when away from home he becomes tense and panicky.  AR350.  Dr. Price concluded Mr. Springer's worry, panicking, low mood, moodiness, and social apprehension prevent him from performing his current job.  AR350.  The ALJ gave this opinion **little weight**.  The ALJ explained the opinion was rendered after a single examination and is a "poor substitute" for a longitudinal perspective when opining one's ability to perform basic work activities, plus it addressed only Mr. Springer's ability to perform one of his past jobs and not his ability to perform other types of work.  Finally, the ALJ explained, the claimant's ability to work is an issued reserved to the Commissioner.  AR20.

*Treating Physician Jonathon Bannwarth, M.D.* rendered an opinion on June 9, 2017.  AR426.  Dr. Bannwarth completed a "work ability" form for purposes of rental assistance.  Id.  Dr. Bannwarth indicated Mr. Springer suffered from panic disorder, anxiety disorder, depressive disorder, complex sleep apnea, and avoidant dependent personality traits.  Id.  Dr. Bannwarth indicated Mr. Springer was not able to work because his mental illness adversely impacted his ability to function in a job setting.  Id.  Dr. Bannwarth explained Mr. Springer was unable to attend training programs or search for employment.  Id.  The ALJ assigned this opinion **little weight**.  AR20.  The ALJ acknowledged Dr. Bannwarth was a treating physician, but stated the opinion was not explained in any detail, and did not identify function-by-function limitations.  Id.  The ALJ further stated the opinion was inconsistent with Mr. Springer's mental status findings, physical exam findings, treatment history, or activities of daily living.  Id.  Lastly, the ALJ explained, whether a claimant is able to work is an issue reserved to the Commissioner.  Id.

*Treating Physician, Bradley Kamstra, M.D.*, rendered an opinion on November 6, 2017.  AR 431-32.  Dr. Kamstra noted Mr. Springer was applying for Social Security Disability due to cerebral palsy that was diagnosed when he was two years old.  AR431.  Dr. Kamstra noted Mr. Springer was at the office asking for forms

to be filled out. AR431. Dr. Kamstra noted Mr. Springer had a history of cerebral palsy, and his biggest deficit was in his right arm. Id. Dr. Kamstra stated, "I think the physical disability in addition to the psychological issues certainly have been compounded, and I do not foresee any changes that are going to happen, especially with the cerebral palsy. I think he will start getting more weakness and maybe some spasticity." Id. Examination noted Mr. Springer's arm "is kind of held at his side. He has boutonniere type deformity[14] of his hand and certainly a weakness and immobility of that area. It is not completely flaccid. He can move it some, but he doesn't have the strength as compared to his left arm." AR432. Dr. Kamstra also noted Mr. Springer's mental issues will be an ongoing issue. AR431. Dr. Kamstra wrote a "to whom it may concern" letter, stating Mr. Springer was unable to work until further notice, and authorized Mr. Springer for a companion animal due to his mental health symptoms. AR436-37. The ALJ assigned this medical opinion **little weight.** AR21. The ALJ acknowledged Dr. Kamstra was a treating physician, but stated the opinion was not explained in any detail whatsoever. Id. Also, the opinion did not identify any function-by-function limitations. Id. The ALJ also stated Dr. Kamstra's opinion was inconsistent with Mr. Springer's mental status exam findings, physical exam findings, treatment history, and activities of daily living. Id. Finally, the ALJ stated that a claimant's ability to work is an issue reserved to the Commissioner. Id.

Medical opinions are considered evidence which the ALJ will consider in determining whether a claimant is disabled, the extent of the disability, and the claimant's RFC. See 20 C.F.R. § 404.1527. All medical opinions are evaluated according to the same criteria, namely:

--whether the opinion is consistent with other evidence in the record;

---

[14] Boutonnière deformity is a deformity in which the middle finger joint is bent in a fixed position inward (toward the palm) and the outermost finger joint is bent excessively outward (away from the palm).
See https://www.merckmanuals.com/home/bone,-joint,-and-muscle-disorders/hand-disorders/boutonni%C3%A8re-deformity. The Merck Manual illustration of a boutonniere deformity is attached to this opinion as Appendix A. It can also be found at the website listed above.

--whether the opinion is internally consistent;

--whether the person giving the medical opinion examined
     the claimant;

--whether the person giving the medical opinion treated the
     claimant;

--the length of the treating relationship;

--the frequency of examinations performed;

--whether the opinion is supported by relevant evidence,
     especially medical signs and laboratory findings;

--the degree to which a nonexamining or nontreating
     physician provides supporting explanations for their
     opinions and the degree to which these opinions
     consider all the pertinent evidence about the claim;

--whether the opinion is rendered by a specialist about
     medical issues related to his or her area of specialty;
     and

--whether any other factors exist to support or contradict the
     opinion.

See 20 C.F.R. § 404.1527(c)(1)-(6); Wagner v. Astrue, 499 F.3d 842, 848

(8th Cir. 2007).

"A treating physician's opinion is given controlling weight 'if it is well-

supported by medically acceptable clinical and laboratory diagnostic

techniques and is not inconsistent with the other substantial evidence.' "

House v. Astrue, 500 F.3d 741, 744 (8th Cir. 2007) (quoting Reed, 399 F.3d at

920); 20 C.F.R. § 404.1527(c). "A treating physician's opinion 'do[es] not

automatically control, since the record must be evaluated as a whole.' " Reed,

399 F.3d at 920 (quoting Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995)).

The length of the treating relationship and the frequency of examinations of the claimant are also factors to consider when determining the weight to give a treating physician's opinion. 20 C.F.R. § 404.1527(c). "[I]f 'the treating physician evidence is itself inconsistent,' " this is one factor that can support an ALJ's decision to discount or even disregard a treating physician's opinion. House, 500 F.3d at 744 (quoting Bentley, 52 F.3d at 786; and citing Wagner, 499 F.3d at 853-854; Guilliams v. Barnhart, 393 F.3d 798, 803 (8th Cir. 2005)). "The opinion of an acceptable medical source who has examined a claimant is entitled to more weight than the opinion of a source who has not examined a claimant." Lacroix v. Barnhart, 465 F.3d 881, 888 (8th Cir. 2006) (citing 20 C.F.R. §§ 404.1527)); Shontos v. Barnhart, 328 F.3d 418, 425 (8th Cir. 2003); Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998)).

When opinions of consulting physicians conflict with opinions of treating physicians, the ALJ must resolve the conflict. Wagner, 499 F.3d at 849. Generally, the opinions of non-examining, consulting physicians, standing alone, do not constitute "substantial evidence" upon the record as a whole, especially when they are contradicted by the treating physician's medical opinion. Id.; Harvey v. Barnhart, 368 F.3d 1013, 1016 (8th Cir. 2004) (citing Jenkins v. Apfel, 196 F.3d 922, 925 (8th Cir. 1999)). However, where opinions of non-examining, consulting physicians along with other evidence in the record form the basis for the ALJ's decision, such a conclusion may be supported by substantial evidence. Harvey, 368 F.3d at 1016. Also, where a nontreating physician's opinion is supported by better or more thorough

medical evidence, the ALJ may credit that evaluation over a treating physician's evaluation. Flynn v. Astrue, 513 F.3d 788, 792 (8th Cir. 2008) (citing Casey v. Astrue, 503 F.3d 687 at 691-692 (8th Cir. 2007)). The ALJ must give "good reasons" for the weight accorded to opinions of treating physicians, whether that weight is great or small. Hamilton v. Astrue, 518 F.3d 607, 610 (8th Cir. 2008); 20 C.F.R. 404.1527(c)(2).

Certain ultimate issues are reserved for the Agency's determination. 20 C.F.R. § 416.927(e). Any medical opinion on one of these ultimate issues is entitled to no deference because it "invades the province of the Commissioner to make the ultimate disability determination." House, 500 F.3d at 745 (citing Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002)). See 20 C.F.R. § 404.1527(d). The ultimate issues reserved to the Agency are as follows:

1. whether the claimant is disabled;

2. whether the claimant is able to be gainfully employed;

3. whether the claimant meets or equals a Listing;

4. what the claimant's RFC is; and

5. what the application of vocational factors should be.

See 20 C.F.R. § 404.1527(d)(1) and (2); see also Heino v. Astrue, 578 F.3d 873, 879 (8th Cir. 2009) (ALJ need not adopt physician's opinion on the ultimate issue of whether claimant can work); Wagner, 499 F.3d at 849 (same); Qualls v. Apfel, 158 F.3d 425, 428 (8th Cir. 1998) (same). The RFC determination is specifically noted to be one of those determinations that are

an ultimate issue for the Agency to determine.  20 C.F.R. § 404.1527(d)(2); <u>Cox</u>, 495 F.3d at 619-620.

Ms. Springer's claim was filed in March, 2016.  As to claims filed with the SSA *after* March 27, *2017*, the regulations regarding acceptable medical sources, medical opinions, and how the SSA must articulate the way it weighs the medical evidence, have been completely re-written.  <u>See</u> 20 C.F.R. §§ 416.920c, 404.1520c.  Under those new regulations, a treating physician's opinion will no longer be given controlling weight.  Instead, the supportability and consistency of an opinion will be the paramount factors for the ALJ to consider when evaluating a medical opinion.  <u>Compare</u>:  20 C.F.R. § 404.1520c (applicable to claims filed on or after March 27, 2017) <u>to</u> 20 C.F.R. § 404.1527(c) (applicable to claims filed before March 27, 2017).  <u>See also</u>: https://www.ssa.gov/disability/professionals/bluebook/revisions-rules.html. Mr. Springer discusses the new regulation at length in his brief, but the court finds the new regulation inapplicable to his claim by the very terms of the new regulation—i.e. it only applies to claims filed *on or after* March 27, 2017, which excludes Mr. Springer's 2016-filed claim.

The ALJ assigned "partial" weight to the opinions of the State agency consultants (both medical and psychological) who never examined or treated Mr. Springer.  The ALJ gave "little" weight to each of Mr. Springer's treating physicians (both medical and psychological) because, the ALJ stated, those treating physician opinions either did not contain enough detail (Dr. Meyer, Dr. Bannwarth, Dr. Price, Dr. Kamstra) or because those opinions addressed

the "ultimate issue" of disability without assigning function-by-function limitations, (Dr.  Bannwarth, Dr. Price, Dr. Kamstra).

Because it appears the ALJ did not accept any of the medical opinion evidence as to Mr. Springer's functional abilities but instead substituted its own inferences, it is necessary to remand this case so the ALJ may further develop the record with additional evidence pursuant to 20 C.F.R. § 404.1520b. When the record is complete, the ALJ is instructed to properly weigh the evidence pursuant to  20 C.F.R. § 404.1527(c).

**3.    Whether the Commissioner's Step 5 Determination That There Are Significant Numbers of Other Occupations Mr. Springer is Capable of Performing is Supported by Substantial Evidence in The Record.**

Mr. Springer asserts the Commissioner's Step 5 analysis is not supported by substantial evidence in the record for two reasons, which are discussed below.

**a.    Whether the VE's Testimony Is Inconsistent With the DOT.**

When a vocational expert (VE) provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE's evidence and the information provided  in the Dictionary of Occupational Titles.  Jones v. Astrue, 619 F.3d 963, 977-78 (8th Cir. 2010).  This responsibility is mandated by the Commissioner's own Policy, SSR 00-4p.  Id.  An ALJ cannot rely on expert testimony that conflicts with the job classifications in the DOT unless there is evidence in the record to rebut the DOT classifications.  Id.  And when the VE

testimony conflicts with the DOT, the DOT controls when the DOT classifications are not rebutted.  Id. at 978.

Mr. Springer  asserts there is an unexplained discrepancy between the RFC as described by the ALJ and the VE's testimony regarding the jobs identified as being consistent with said RFC.  Specifically, in its written decision, the ALJ indicated Mr. Springer was capable of "only simple, routine tasks, with simple, work-related decisions. . ."  Mr. Springer asserts this limitation is inconsistent with the Reasoning Level of the jobs identified as appropriate for him by the VE, which require Reasoning Levels of 2 or 3.

The Dictionary of Occupational Titles (DOT) contains several component sections which define the requirements of the jobs contained therein.  The General Educational Development (GED) component includes a Reasoning Level for each occupation within the DOT that corresponds to the ability required for satisfactory job performance.  See DOT at 1009-11.  Hulsey v. Astrue, 622 F.3d 917, 923 (8th Cir. 2010).

Mr. Springer asserts the ALJ's restriction to "only simple, routine tasks, with simple, work-related decisions. . ." is consistent with only the lowest Reasoning Level in the DOT, which is  Level 1.   But the occupations identified by the VE as being consistent with the RFC as formulated for Mr. Springer contain Reasoning Levels of 2 (Copy Machine Operator, DOT 207.685-014); (Mail Clerk, DOT 209.687-026); and 3 (Mail Clerk, DOT 209.687-026).

There as six  Reasoning Levels within the GED.  They are described as follows:

Level 1: Apply commonsense understanding to carry out simple one-or-two-step instructions.  Deal with standardized situations with occasional or no variables in or from these situations encountered on the job.

Level 2:  Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions.  Deal with problems involving a few concrete variables in or from standardized instructions.

Level 3:  Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form.  Deal with problems involving several concrete variables in or from standardized situations.

Level 4:  Apply principles of rational systems to solve practical problems and deal with a variety of concrete variables in situations where only limited standardization exists.  Interpret a variety of instructions furnished in written, oral, diagrammatic or schedule form.  (Examples of rational systems include bookkeeping, internal combustion engines, electric wiring systems, house building, farm management, and navigation).

Level 5:  Apply principles of logical or scientific thinking to define problems, collect data, establish facts, and draw valid conclusions.  Interpret an extensive variety of technical instructions in mathematical or diagrammatic form.  Deal with several abstract and concrete variables.

Level 6:  Apply principles of logical or scientific thinking to a wide range of intellectual and practical problems.  Deal with nonverbal symbolism (formulas, scientific equations, graphs, musical notes, etc.) in its most difficult phases.  Deal with a variety of abstract and concrete variables.  Apprehend the most abstruse classes of concepts.

See Dictionary of Occupational Titles, Appendix C.

Mr. Springer is correct that the mail sorter position is clearly outside the parameters of the RFC as described by the ALJ.  The mail sorter job has an assigned Reasoning Level of 3 ("apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form.  Deal with

problems involving several concrete variables in or from standardized situations"), the description of which exceeds the ALJ's defined RFC limitation of "only simple, routine tasks, with simple, work-related decisions. . ." The other two jobs (copy machine operator and clerical checker) have an assigned Reasoning Level of 2.

Mr. Springer cites Hulsey, 622 F.3d at 923 and Lucy v. Chater, 113 F.3d 905, 909 (8th Cir. 1997) for the proposition that an RFC indicating unskilled, light duty or sedentary jobs that require the ability to carry out no more than "simple instructions" can only be matched with jobs that carry a Reasoning Level of 1. The law in the Eighth Circuit is explained below.

In Lucy, in addition to his physical impairments, the claimant had been diagnosed with borderline intellectual functioning. Lucy, 113 F.3d at 907. The ALJ, however, found that Mr. Lucy's borderline intellectual functioning did not substantially limit his capacity to perform the full range of sedentary work. Id. Mr. Lucy appealed, claiming his non-exertional mental limitations further limited his RFC. Id. In that case, the VE testified that Mr. Lucy could "follow simple instructions, and consequently [his] impairment does not prevent him from engaging in a full range of sedentary work." Id. at 909. The Eighth Circuit rejected this explanation. The court noted that the SSA's own list of unskilled sedentary jobs indicates many jobs within that range require more than the mental capacity to follow simple instructions. Id. The court referred to the DOT Reasoning Level scale assigned to each job description, and distinguished a Reasoning Level 1 which required only the ability to

"understand and carry out simple instructions" while a Reasoning Level 2 requires "the ability to understand and carry out detailed instructions." Id. The court noted that many unskilled sedentary jobs require Level 2 or higher reasoning skills and therefore, contrary to the ALJ's conclusion, Mr. Lucy's borderline intellectual functioning did have an impact on his capacity to perform the full range of sedentary work. Id.

In Hulsey, the Social Security claimant again had borderline intellectual functioning. Hulsey, 622 F.3d at 921. On appeal, Ms. Hulsey asserted the ALJ did not properly account for her mental impairments in the RFC by posing a hypothetical to the VE which limited her to superficial interpersonal contact. Id. In the context of discussing this assignment of error, the court discussed the Reasoning Levels assigned within the SVP codes of the DOT occupations. Id. at 923. The court explained that the Reasoning Level "corresponds to the ability to follow instructions and solve problems that is required for satisfactory job performance." Id. The court further explained that "only occupations with a reasoning development level of one necessarily involve only simple instructions. At reasoning development level two, occupations might necessitate applying 'commonsense understanding to carry out detailed but uninvolved written or oral instructions' and dealing with 'problems involving a few concrete variables in or from standardized situations.'" Id. (citing Dictionary of Occupational Titles). In Hulsey the court found the VE had identified appropriate occupations, because at least one of the occupations

identified did have an assigned Reasoning Level of 1—the lowest possible reasoning level within the DOT.  Id.

In Moore v. Astrue, 623 F.3d 599 (8th Cir. 2010), the claimant's IQ placed him in the borderline intellectual functioning category.  Id. at 601.  The RFC as it was articulated by the ALJ indicated Mr. Moore was "able to handle simple job instructions" and "capable of performing basic mental demands of simple, routine, and repetitive work activity at the unskilled task level."  Id. at 601-02.  On Appeal, the claimant argued the jobs the VE identified as suitable for him were inconsistent with the DOT because the Reasoning Level required for those jobs was Reasoning Level 2, whereas Mr. Moore argued the Reasoning Level as it was articulated by the ALJ in Mr. Moore's RFC equated to only a Reasoning Level 1.  Id. at 604.  The Eighth Circuit disagreed.  Id. The court explained that though the ALJ limited Mr. Moore to "simple, routine and repetitive work activity," and to "carrying out simple job instructions," the ALJ did *not* limit Mr. Moore to "simple one-or-two-step instructions."  Id.  Further, the court found, "[t]here is no direct conflict between 'carrying out simple job instructions' for 'simple routine and repetitive work activity,' as in the hypothetical, and the vocational expert's identification of occupations involving instructions that, while potentially detailed, are not complicated or intricate."  Id.  Therefore, the court concluded, the hypothetical which limited Mr. Moore to simple job instructions and simple, routine and repetitive work activity was consistent with DOT jobs that required Level 2 Reasoning skills.  Id.

The Eighth Circuit discussed the difference between Level 1 and Level 2 Reasoning again more recently in <u>Stanton v. Commissioner, Social Security Administration</u>, 899 F.3d 555 (8th Cir. 2018). In <u>Stanton</u>, the court discussed in more detail the minutiae of the difference between Level 1 and Level 2 Reasoning as defined by the DOT. <u>Id.</u> at 558-60. The court ultimately determined there was an unresolved conflict in the VE's testimony between the job identified by the VE and the DOT, because the job identified as being one the claimant was capable of performing required Level 2 reasoning, while the RFC described by the ALJ indicated the claimant was capable of only Level 1 reasoning skills. <u>Id.</u> at 558.

In <u>Stanton</u>, the court also made the following fine distinction between the definitions of Level 1 and Level 2 Reasoning: during the hearing when reciting the hypothetical to the VE and in its written decision, the ALJ formulated the claimant's RFC as having the ability to "understand, retain and carry out one-to two-step instructions." <u>Id.</u> at 558. The court explained "these statements correspond directly to language used by the Dictionary to describe Level 1 Reasoning." <u>Id.</u>

The court contrasted the ALJ's hypothetical and ultimate RFC formulation to different language which merely limits the claimant to "carrying out simple job instructions" and "simple, routine and repetitive work activity." <u>Id.</u> at 559. A person with such a described RFC, the court held, "may be able to perform work requiring Level 2 Reasoning." <u>Id.</u> (citing <u>Moore</u>, 623 F.3d at 604. The difference between <u>Stanton</u> and <u>Moore</u> the court emphasized, is that

the ALJ in <u>Moore</u> did not limit job instructions to simple *one or two-step* instructions or otherwise indicate the claimant could only perform occupations at DOT Reasoning Level 1.  <u>Id.</u>  In <u>Stanton</u> the ALJ did so limit the claimant. <u>Id.</u>  Therefore, the language used by the ALJ in <u>Moore</u> was properly construed as compatible with Reasoning Level 2, whereas the slightly different language used by the ALJ was not properly construed as compatible with Reasoning Level 1 in <u>Stanton</u>.

The court now returns to the language in the RFC as it was articulated in the hypothetical to the VE and in the ALJ's written decision in this case.  In both instances, the ALJ used the phrase "simple routine tasks" and "simple work-related decisions."  AR16, AR109.  According to <u>Moore</u> and <u>Stanton</u>, this phraseology is not inconsistent with a job whose description contains a Reasoning Level 2 requirement.  <u>Moore</u>, 623 F.3d at 604, <u>Stanton</u>, 899 F.3d at 558.  The court  will therefore not remand based on this assignment of error.

**b.  Whether the VE Must Identify Work Which Exists in An Area Smaller Than The "National" Economy**

Next, Mr. Springer alleges the ALJ's Step 5 analysis is not supported by substantial evidence in the record because the VE stated the number of  jobs he identified as suitable for Mr. Springer were the number of jobs that were available "nationally."  Mr. Springer asserts this is insufficient to meet the SSA's own statutory and regulatory requirements.  The court agrees.

At step 5, the ALJ found there were other jobs Mr. Springer could perform within the RFC as formulated by the ALJ.  AR22-23.  The ALJ's conclusion was based on testimony from the VE that there were 49,000 copy

machine operator, and 68,000 clerical checker jobs available "nationally."

AR735.[15]  By testifying to the number of jobs available in the entire United

States, Mr. Springer alleges the VE and the ALJ used the wrong standard.  His

argument is based on statutory language.

Section 423(d) of Title 42 provides in pertinent part as follows:

> (d) "Disability" defined
>
> (1)The term "disability" means—
> (A) Inability to engage in any substantial gainful
> activity by reason of any medically determinable
> physical or mental impairment which can be expected
> to result in death or which has lasted or can be
> expected to last for a continuous period of not less
>  than 12 months;
> * * *
> (2) For purposes of paragraph (1)(A)—
> (A) An individual shall be determined to be under a disability only
> if his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which exists
> in the national economy, regardless of whether such work exists in
> the immediate area in which he lives, or whether a specific job
> vacancy exists for him, or whether he would be hired if he applied
> for work.  **For purposes of the preceding sentence** (with respect
> to any individual), **"work which exists in the national economy"
> means work which exists in significant numbers either in the
> region where such individual lives or in several regions of the
> country.**

See 42 U.S.C. § 423(d)(1)(A) and (2)(A) (emphasis added).

What is clear from the above emphasized language is that "work which

exists in the national economy" is a term of art in Social Security law.  It does

---

[15] The court has not included the 55,000 mail clerk jobs because as explained
above, that job requires a Reasoning Level 3, which is inconsistent with the
RFC as described by the ALJ.

not mean work in the entire United States.  Instead, it means "work which exists in significant numbers either in the *region* where such individual lives or in *several regions* of the country."  Id. (emphasis added).  Now, what does that definition mean exactly?

The Commissioner's regulation, 20 C.F.R. § 404.1566, does not define "region."  Id.  It says that "region" is not equal to "immediate area."  Id. at (a)(1).

To adopt the Commissioner's position—a position repeatedly asserted before this court in a number of Social Security appeals—would be to disregard a portion of the statutory language.  The statute states clearly ***" 'work which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."***  42 U.S.C. § 423(d)(2)(A).

The Commissioner would have this court ignore this plain statutory mandate.  This, the court cannot do for the Supreme Court teaches that every provision of a statute must be given effect when construing it:  where a statute can be interpreted so as to give effect to all portions of the statute, that interpretation must prevail over an interpretation that nullifies some portion of the statute.  Morton v. Mancari, 417 U.S. 535, 551 (1974).  "If the intent of Congress is clear, that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 665 (2007) (quoting Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984)).

Congressional intent is clear:  the Commissioner *does* have to show that jobs exist in Mr. Springer's "region" or in "several regions of the country." 42 U.S.C. § 423(d)(2)(A).  We know from the statutory language that "region" does *not* mean "immediate area."  Id.  The Commissioner's regulation likewise does not define "region," but only says that "region" is not equal to "immediate area."  20 C.F.R. § 404.1566(a)(1).

In Barrett v. Barnhart, 368 F.3d 691, 692 (7th Cir. 2004), the court held the "other regions" language that Congress used in § 423(d)(2)(A) was intended to prevent the Social Security Administration from denying benefits on the basis of isolated jobs existing only in very limited numbers in relatively few locations outside the claimant's region.  This sentiment is paralleled in the Commissioner's regulation where it states:  "[i]solated jobs that exist only in very limited numbers in relatively few locations outside of the region where you live are not considered 'work which exists in the national economy.'  We will not deny you disability benefits on the basis of the existence of these kinds of jobs."  20 C.F.R. § 404.1566(b).

The dictionary defines "region" as "a large, indefinite part of the earth's surface, any division or part."  Webster's New World Dictionary, at 503 (1984).  "A subdivision of the earth or universe."  OED (3d ed. Dec. 2009).  We know from Congress' statute and from the Commissioner's regulation, that "region" does not mean the entire country.  See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 1566(b).  The dictionary defines "region" as an indefinite parcel that is part of the whole, and so must be something less than the whole.  The court

78

concludes, as it must, that "nationwide" does not truly mean "nationwide." Such is the nature of agency law. Instead, at Step 5, the ALJ must find that jobs the claimant can do exist in substantial numbers in the claimant's own "region" (something less than the whole nation), or in "several regions" (several parts that, together, consist of something less than the whole nation). Id.

The Commissioner cites Johnson v. Chater, 108 F.3d 178 (8th Cir. 1997), in support of the assertion that in the Eighth Circuit, "nationwide" does indeed mean the entire country. But that is not what Johnson says. In the Johnson case, the claimant appealed the issue whether the VE's testimony was sufficient to prove that there were jobs existing in substantial numbers in the national economy. Id. at 178. The VE had testified that Johnson could perform sedentary, unskilled work such as being an addresser or document preparer. Id. at 179. The VE said that there were 200 such positions in Iowa and 10,000 such positions nationwide. Id. Johnson took issue with whether 200 positions in his home state of Iowa constituted "substantial" numbers of jobs. Id. at 180 n.3. The court rejected Johnson's argument and held that the VE's "testimony was sufficient to show that there exist a significant number of jobs in the economy that Johnson can perform." Id. at 180.

The facts in Johnson stand in stark contrast to the facts in Mr. Springer's case. In Johnson, the VE testified to the number of jobs available in the claimant's *region* (in that case, his state), and also the number of jobs available in the whole country. Id. at 179. Here, the VE testified *only* to the number of jobs available "nationally." AR110. As established above, both

79

§ 423(d)(2)(A) and § 404.1566 require more specificity than that.  The ALJ and

the VE must find that substantial numbers of jobs are available in

Mr. Springer's region or in several regions.  See Harris v. Barnhart, 356 F.3d

926, 931 (8th Cir. 2004) (the ALJ must find at step five that claimant is

"capable of performing work that exists in significant numbers within the

regional and national economies.") (emphasis added).

The Commissioner also cites an Eleventh Circuit case, Allen v. Bowen,

816, F.2d 600, 603 (11th Cir. 1987), for the proposition that the rule requires

only that the Commissioner show appropriate jobs that exist in the national

economy.  In Allen, the VE at the agency level had identified jobs available in

the area where the claimant resided, as well as the number of jobs in the state

where he lived, and the number of jobs available nationally.  Allen, 816 F.2d at

602.  Mr. Allen appealed, arguing there were insufficient numbers of jobs in his

local economy to constitute "significant" numbers.  Id. at 603.  The Allen court

rejected his claim, citing Matthews v. Eldridge 424 U.S. 319, 336 (1976), for

the proposition that the proper inquiry is whether there is a significant number

of jobs available in the national economy, and that there had been plenty of

evidence of these jobs submitted at the administrative level.  Id.  The court

does not find Allen persuasive.

The Allen court cited Matthews for the proposition that the Social

Security Administration need only show that jobs exist in significant numbers

in the national economy.  But in Matthews, the court merely cited the

"immediate area" language of 42 U.S.C. § 423(d)(2)(A) for the proposition that

80

the Commissioner need not find a specific job vacancy in the claimant's "immediate area." Matthews, 424 U.S. at 336. The Court noted in footnote 14, however, that the term "national economy" was further defined by reference to a region or several regions. Id. at n. 14. And Allen cites Matthews for the proposition that the Commissioner need only show that jobs exist in the national economy, without expounding upon the precise meaning of that term. Allen, 816 F.2d at 603.

The Commissioner also cites Gutierrez v. Commissioner, 740 F.3d 519, 523 (9th Cir. 2014) for the proposition that the phrase "several regions of the country" is equivalent to "national economy." See Commissioner's brief (Docket No. 18) at p. 19. The Commissioner also suggests at p. 20 of its brief that this court should "defer to the Agency's interpretation that jobs exist in the national economy includes work that exists in several regions in the country." Id. From this statement, the Commissioner then concludes that remanding the case would be a waste of time because it would not change the outcome. This is so, the Commissioner argues, because the end result would be only to "change the ALJ's finding from a significant number of jobs [that] exist in the national economy to a significant number of jobs [that] exist in either the region where Plaintiff lives or in several regions in the country [.]

The court does not find Gutierrez outcome-determinative here. First, in that case, the denial of benefits was affirmed for alternative reasons. Gutierrez, 740 F.3d at 523-24, 528-29. Specifically, the court found the ALJ identified a

significant amount of jobs in the claimant's "region" and in the "several regions" or "national economy."  Id. at 523-24, 528-29.

The VE identified jobs for the claimant not only in the "several other regions" under 20 C.F.R. §  404.1566(a) and 42 U.S.C. § 423(d)(2)(A), but also in the "region where the claimant lived" under those same statutes and regulations.  See Gutierrez, 740 F.3d at 523-24.  The Ninth Circuit specifically held that the state of California was properly deemed the "region" where the claimant lived, and that 2,500 jobs constituted a significant number of jobs in that region.  Id. at 523.  The court then stated,  "the statute in question indicates that the significant number of jobs can be *either* regional jobs (the region where the claimant resides) *or* in several regions of the country (national jobs) . . . If we find *either* of the two numbers significant, then we must uphold the ALJ's decision."  Id. at 523-24 (cleaned up).  In his brief in this case, the Commissioner cites this passage in Gutierrez for the proposition that "national "economy" is interchangeable with "several regions" and therefore, when the VE in this case identified solely the number of jobs in the national economy, the Commissioner satisfied his statutory obligation.

But the Gutierrez court offered no rationale for asserting the meaning of "several regions" standing alone, was synonymous with "national economy," especially when no information was offered was cited by the VE about the jobs that were cited as being available in the "national economy."  Id.  To the contrary,  the court qualified its holding in Gutierrez by referring to its earlier statement in Beltran v. Astrue, 700 F.3d 386 (9th Cir. 2012).

> We assess the 25,000 nationwide figure in the context of "several regions of the country." See, Beltran, 700 F.3d at 390 (holding that the national job figure cannot stand alone and must be considered in light of the fact that it represents jobs in *several* regions). At the same time, we also assess whether the national jobs are significant in light of 20 C.F.R. § 416.966(b), which states that "isolated jobs that exist only in very limited numbers in relatively few locations outside of the region where [a claimant lives] are not considered work which exists in the national economy."

Gutierrez, 740 F.3d at 528-29. Nevertheless, the Gutierrez court found that 25,000 jobs which existed "nationally" was sufficient to satisfy the Commissioner's duty to locate jobs in a "significant" number which the claimant was capable of performing as required by statute. Id. at 529.

In Beltran, the Ninth Circuit reversed and remanded because it determined the Commissioner's finding that there was a significant number of jobs the claimant could perform was not supported by substantial evidence. Beltran, 700 F.3d at 391. In that case, the VE testified there were 135 regional jobs and 1,680 national jobs available. Id. at 388. The ALJ concluded each of those numbers were "significant" and denied benefits. Id. at 389. The Beltran court concluded 135 regional jobs was not a significant number. Id. at 390. So, it turned to whether 1,680 jobs at the "national" level qualified as a significant number. Id. But, the court noted, it could not consider the 1,680 jobs as a stand-alone figure; rather, as the statute required, it must consider this number in light of the fact that it represents jobs across *several regions.* Id. Though 1,680 jobs might seem a significant number standing alone, when those jobs were distributed between several regions across the nation, it was not a significant number after all. Id. Looking toward the pool of existing jobs,

"Congress did not intend to foreclose a claimant from disability benefits on the basis of the existence of a few isolated jobs." Id. The court determined therefore, that it would be "unconscionable" to expect the claimant to try to find one of the 135 regional or 1,680 jobs that were "scattered across several regions." Id. at 391.

The Commissioner also cites the 1967 legislative history of 42 U.S.C. § 423(d)(2)(A). The language cited by the Commissioner was offered to clarify the meaning of "work which exists in the national economy" as used in the statute. See Commissioner's brief, Docket 18, p. 19. The Commissioner cites the House of Representatives Congressional Record. See 113 Cong. Rec. H16855 (Dec. 13, 1967). The language cited by the Commissioner is from that portion of the legislative history that is found in the House Debate (Section V.B in the Table of Contents). It is as follows:

> The conference report contains substantially the provision of the House bill, but includes language designed to clarify the meaning of the phrase "work which exists in the national economy." Under the added language, "work which exists in the national economy" means work that exists in significant numbers in the region in which the individual lives or in several regions in the country. This language puts into the statute the same meaning of the phrase "work which exists in the national economy" that was expressed in the reports of both the House and Senate Committees. In this regard both reports contain the following statement:

>> It is not intended, however, that a type of job which exists only in very limited numbers or in relatively few geographic locations would be considered as existing in the national economy.

> When the term "significant numbers" is used it is not intended that a great many jobs must exist in the region in which an individual lives or in several regions of the country. What is intended is that

the number of such jobs must be more than just a few; that is, more than insignificant.

See 113 Cong. Rec. H16855 (Dec. 13, 1967) (Section V.B, House Debates).   In its brief, the Commissioner seizes upon the language in the final paragraph in favor if its argument that "several regions" and "national economy" are functional equivalents for purposes of 42 U.S.C. § 423(d)(2)(A).

When the House made its official Conference Report which reconciled the differences in the disagreeing votes of the two Houses, however, the comments in that final paragraph were omitted.  The stated purpose of the Conference Report was to meet on their disagreeing votes of the two houses (House and Senate) and to recommend to the House and Senate's respective houses to recede from certain disagreeing amendments.  The following language is what appears in House Conference Report No. 1030 regarding the definition of disability:

> The conference agreement contains substantially the provision of the house bill, but includes language designed to clarify the meaning of the phrase "work which exists in the national economy."  This language puts into the statute the same meaning of the phrase that was expressed in the reports of both committees.  Under the added language, "work which exists in the national economy" means work that exists in significant numbers in the region which the individual lives or in several regions in the country.  The purpose of so defining the phrase is to preclude from the disability determination consideration of a type or types of jobs that exist only in very limited number *or* in relatively few geographic locations in order to assure that an individual is not denied benefits on the basis of the presence in the economy of isolated jobs he could do.

Id. at p. 52 (emphasis added).

Additionally, as the court has explained above, the court must reconcile the Commissioner's assertion (that the required "significant number of jobs" can be *either* "regional" or "national" jobs) with the dual mandate of 20 C.F.R. § 404.1566(b) which states "isolated jobs that exist only in very limited numbers in relatively few locations outside the region where you live are not considered 'work which exists in the national economy.' We will not deny you disability benefits on the basis of the existence of these kinds of jobs."

In Mr. Springer's case, the VE identified solely the number of jobs which exist "nationally." The court has no frame of reference as to where these jobs are located. Though each number (49,000 copy machine operator, and 68,000 clerical checker jobs) may qualify as a "significant" number of jobs, what if those jobs are all or mostly located in Alaska and Hawaii? Or even in California and New York? Though that is not probable, the record contains no information to the contrary. And if it is so, such jobs, would not meet the mandate of 20 C.F.R. § 404.1566(b).

The burden on is on the Commissioner at Step 5 of the sequential analysis. <u>Johnson</u>, 108 F.3d at 180. Therefore, the absence of valid evidence of substantial numbers of jobs in Mr. Springer's "region" or in "several regions" (which this court does not believe is the equivalent of national jobs) is an absence of evidence that cuts against the Commissioner. While this court might hazard a guess that there are substantial numbers of copy machine operator and clerical checker jobs available in South Dakota, or in the several regions consisting of South Dakota, North Dakota, Minnesota, Iowa, and

Nebraska, or even in several other regions in the country, this court is not allowed to guess about facts that might have been able to have been adduced at the agency level. The failure of proof required at this Step is another reason this case requires reversal and remand.

## G.    Type of Remand

For the reasons discussed above, the Commissioner's denial of benefits is not supported by substantial evidence in the record. Mr. Springer requests reversal of the Commissioner's decision with remand and instructions for an award of benefits, or in the alternative reversal with remand and instructions to reconsider her case.

Section 405(g) of Title 42 of the United States Code governs judicial review of final decisions made by the Commissioner of the Social Security Administration. It authorizes two types of remand orders: (1) sentence four remands and (2) sentence six remands. A sentence four remand authorizes the court to enter a judgment "affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

A sentence four remand is proper when the district court makes a substantive ruling regarding the correctness of the Commissioner's decision and remands the case in accordance with such ruling. Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000). A sentence six remand is authorized in only two situations: (1) where the Commissioner requests remand before answering the Complaint; and (2) where new and material evidence is presented that for

good cause was not presented during the administrative proceedings.  Id.
Neither sentence six situation applies here.

A sentence four remand is applicable in this case.  Remand with
instructions to award benefits is appropriate "only if the record overwhelmingly
supports such a finding."  Buckner, 213 F.3d at 1011.  In the face of a finding
of an improper denial of benefits, but the absence of overwhelming evidence to
support a disability finding by the Court, out of proper deference to the ALJ the
proper course is to remand for further administrative findings.  Id.; Cox v.
Apfel, 160 F.3d 1203, 1210 (8th Cir. 1998).

In this case, reversal and remand is warranted not because the evidence
is overwhelming, but because the record evidence should be clarified and
properly evaluated.  See also Taylor v. Barnhart, 425 F.3d 345, 356 (7th Cir.
2005) (an award of benefits by the court is appropriate only if all factual issues
have been resolved and the record supports a finding of disability).  Therefore,
a remand for further administrative proceedings is appropriate.

## CONCLUSION

Based on the foregoing law, administrative record, and analysis, it is
hereby ORDERED that the Commissioner's decision is REVERSED and
REMANDED for reconsideration pursuant to 42 U.S.C. § 405(g), sentence four.

DATED October 1, 2019.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge